No. 20,064.

BENNETT R. WHEELER, *Plaintiff*, V. MATT WEIGHTMAN, Jr., as County Treasurer of Shawnee County, *Defendant*.

### SYLLABUS BY THE COURT.

TAXATION—*Registration Fees for Real-estate Mortgages—Statute Unconstitutional.* Chapter 250 of the Laws of 1915, entitled, "An Act relating to registration fees for, and taxation of, real estate mortgages," contravenes section 1 of article 11 of the constitution, requiring a uniform and equal rate of assessment and taxation, and consequently is void.

Original proceeding in mandamus. Opinion filed June 29, 1915. Motion to quash alternative writ sustained.

*Bennett R. Wheeler,* and *John F. Switzer,* both of Topeka, for the plaintiff.

*W. E. Atchison,* county attorney, *John S. Dean, James A. Troutman,* and *John L. Hunt,* all of Topeka, for the defendant.

*Chester I. Long, A. M. Cowan,* both of Wichita, *S.. H. Allen, Otis S. Allen,* and *George S. Allen,* all of Topeka, as *amici curiæ.*

The opinion of the court was delivered by

BURCH, J.: The action is one of mandamus to compel the county treasurer to accept the registration fee, duly tendered, for a real-estate mortgage and to indorse on the mortgage an official certificate of the payment of such fee, under chapter 250 of the Laws of 1915. The statute is appended to this opinion.

The defendant moves to quash the alternative writ for the reason it does not state facts sufficient to entitle the plaintiff to the desired relief. The motion to quash raises the question of the validity of the statute under article 11 of the constitution, relating to finance and taxation, section 1 of which reads as follows:

"The legislature shall provide for a uniform and equal rate of assessment and taxation; but all property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and personal property to the amount of at least two hundred dollars for each family, shall be exempted from taxation."

The plaintiff claims the act, considered broadly, is one to exempt real-estate mortgages from taxation and to tax the civil privilege of using the public records. The defendant claims the legislature has no power to exempt real-estate mortgages generally from taxation, that the tax levied is not a license, privilege, or excise tax, and that the act embodies an attempt to classify property for purposes of taxation contrary to principles of taxation established by the fundamental law.

It is a matter of common knowledge and regret that the effort to assess and tax real-estate mortgages on the *ad valorem* plan as a part of the general property of the state has been neither satisfactory nor successful. The method is reprobated as involving double taxation. To what extent this criticism is economically sound is not now material. The prejudice created by the double-taxation argument against the method is widespread and deep-seated. It is certain that the method is productive of shameful tax evasion. In 1907 real-estate mortgages were listed for taxation in this state to the amount of $4,000,000. By 1914 the amount was brought up to approximately $70,000,000. It is estimated that the holdings of securities of this character by residents of Kansas are four times the amount listed, but the resources of the tax collecting officials for uncovering such holdings appear to be substantially exhausted. In one city in the state the *ad valorem* tax takes thirty-seven and one-half per cent of the income from a six per cent mortgage and forty-five per cent of the income from a five per cent mortgage. Mortgage holders feel they can not and should not give up such a proportion of their income. In numerous other taxing districts the tax taken is less than one-fourth of the percentages indicated. The result is inequality greater than should result from the administration of a fair and just system. The supply of capital available for farm mortgages is too limited, the interest rate is too high, and the time extended to borrowers is too short for the needs of a state the basis of whose prosperity is agriculture, and it is believed the tax law may be used to render the situation less acute.

The problem of how to deal with real-estate mortgages as subjects of taxation has embarrassed political economists gen-

erally and the legislatures of states other than this. In twenty-eight states real-estate mortgages are taxed as personal property. In six states they are taxed as an interest in real estate. In five states a so-called registry tax is imposed, which takes the place of all other taxes. (Alabama, Michigan, Minnesota, New York, Oklahoma.) In nine states real-estate mortgages are exempt. (Colorado, Idaho, Louisiana, Maine, Maryland, New Jersey, Utah, Washington, Wyoming.)

The struggle for tax reform in this state is an interesting story which need not be told here. It has long been recognized that the constitutional provision quoted has outlived its usefulness, and, as outlived restraints usually do, now bars the pathway to the establishment of an equitable system of taxation adequate to the present economic needs of the state. Notwithstanding this fact, at the election in 1914 the people refused to adopt a constitutional amendment permitting the legislature to classify subjects of taxation so far as differences justify, in order to secure a just return from each. Following the lead of New York in 1906, bills have appeared at each session of the legislature, beginning with that of 1907, for the adoption of the registration tax on real-estate mortgages in lieu of all other taxes. In 1909 and 1911 bills of this character were passed by both houses, but were vetoed by the governor. In 1915 senate bill No. 680 became a law, and the question is whether or not the constitution forbids its execution.

The court was given jurisdiction in cases of mandamus by the constitution. The case presented falls within the scope of such jurisdiction. The peremptory writ must either be issued or denied, and it must be issued or denied by the exercise of judicial functions which can not be surrendered. The writ can not be issued or denied without finding out what the constitution permits to be done and what the statute undertakes to do. That is, the court can not escape interpreting the constitution and the law. When the meaning of the constitution is ascertained the law must be interpreted in such a way as to uphold it if possible. In case of an irreconcilable conflict the constitution controls. The course of the inquiry has been well directed and defined by able briefs and oral arguments on behalf of both parties, and on behalf of large interests which favor and which are antagonistic to the law.

The constitutional command is that the legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequisite to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental and can not be evaded by any shift or device whatever.

In 1860 the legislature imposed a tax of three mills on the dollar on the taxable property of the state according to the assessment of that year, and fifty cents on every white male person between the ages of twenty-one and fifty years. These taxes were not collected in certain counties. In 1863 the legislature imposed the aggregate of the uncollected taxes on the property taxable within such counties according to the assessment of the year 1863. In an action of mandamus brought by the attorney-general to compel the officials of Leavenworth county to levy the tax this court said:

"Section 1 of Article 11 of the Constitution, provides that 'the Legislature shall provide for a uniform and equal rate of assessment and taxation,' and this clause most clearly implies that taxes shall be levied only according to such uniform and equal rate. To comply with this provision, [it is clear] that taxes must be assessed uniformly upon the property of all parts of the State, and, while it may be quite consistent with justice and with this constitutional provision that persons owing taxes imposed by the law of 1860, should be compelled to pay them; to collect such taxes of others because they now reside or have property within the same county, unless the whole State is subjected to the same burthen, seems manifestly consistent with neither.

"Reluctant as we are to differ with the legislative branch of the Government, we are compelled to conclude that the Act of 1863, in question, is inconsistent with the provisions of the constitution above cited, and therefore void." (*The State ex rel. The Attorney General v. Commissioners Leavenworth Co.*, 2 Kan. 61, 69.)

The action of the legislature of 1863 was evidently taken through inadvertence and oversight. Its attention was fixed on the delinquency of the counties which had failed to collect the taxes imposed by the law of 1860, and it looked no further than to call upon those counties to make good to the state the taxes lost through their laches. The declaration of the court that in order to comply with the constitution taxes must be assessed uniformly upon the property of all parts of the state expressed the common thought of those who framed and those who adopted the constitution. The territorial act of 1860, to

provide for the assessment and collection of taxes, passed after the constitution was adopted but before the state was admitted into the Union, was framed in accordance with the principle involved. The principle was recognized in the act of 1862 amending and supplementing the territorial act of 1860, and has been recognized in every subsequent revision of the tax law.

In the case of *Hines and others v. The City of Leavenworth and others*, 3 Kan. 186, decided in 1865, the court in an opinion by Chief Justice Crozier discussed the constitutional provision at length. The facts of the case are not now material, but the following extracts from the opinion are of the highest significance:

"Article 11 of our constitution relates exclusively to finance and taxation. The title of the article is 'Finance and Taxation.' Ordinary and extraordinary revenues must be raised in accordance with its provisions. The financial polity of the state must be regulated with reference to its requirements. It authorizes suitable financial arrangements to be made in emergencies and binds the particular organization, whether state or county, to the utmost good faith in the fulfillment of its obligations. It prohibits all favoritism, requiring all to contribute in proportion to their means to the support of the public burdens. . . . It will be observed that the constitution does not in terms require that the property in the state should be taxed according to its value, but it must be apparent to every one that such was the intention of the constitution makers. Taxes can not be levied by an equal and uniform rate except upon the value. If so much were levied upon each acre, lot, horse, cow, sheep, note, bond, &c., the rate might be uniform, but it would be very unequal. . . . The whole property of the state then must be listed and valued for taxation. Now what in common parlance is this operation called? Everybody would say it is denominated 'assessment.' Such is the common acceptation of the word and no one but a professional man would give it any other. The framers of the constitution must have foreseen that different persons would be employed in the different counties to make the assessments, and that they must inevitably differ in their estimates of the value of property. The land, stock &c., in one county might be estimated at a much higher rate than in another, which for state purposes would produce a corresponding irregularity in the taxation. This would be avoided by requiring the rate of assessment to be equal and uniform. And if they desired to accomplish this what better way of doing it than by saying so. . . . The meaning of the first section of article 11 is that the rate of taxes throughout the jurisdiction that levies them must be equal and uniform. If the state levies them the rate must be equal and uniform throughout the state. If the county levies them, then they must be equal and uniform throughout the county, and so of the

township, city or village. It does not mean that a man in one county shall pay the same rate of taxation for all purposes that is paid by a man in an adjoining county. Now, the property of a man residing in the city of Leavenworth should bear the same rate of taxation for state purposes that is borne by the property of a man in the remotest county, and for county purposes, the same rate that other men in the county pay, and for city purposes the same rate paid by other men in the city. Each man in the state, county and city, is equally in proportion to his property interested in maintaining the state, county and city governments, and in that proportion should bear the burdens equally. There is a justice in this arrangement which commends it to the approbation of any right thinking man." (pp. 197, 200, 201.)

In 1881 the legislature undertook to reach for purposes of taxation cattle driven from the Indian Territory into the southern part of the state for grazing purposes. Such cattle were brought into the state after March 1 and were removed before the first of December. In an opinion delivered by Mr. Justice Brewer holding the statute to be unconstitutional, the court said:

"The statute provides for a property tax, and, unlike that considered in the case of *The City of Newton v. Atchison*, 31 Kan. 151, 1 Pac. 288, is subject to the control of § 1 of art. 11 of the state constitution. The argument, briefly stated, is this: All personal property in the state on the first of March is, with the constitutional exemptions, listed for taxation. This therefore enforces the constitutional rule of uniformity. There is no general provision for taxing property brought into the state after the first of March, but by this statute an attempt is made to tax certain kinds of property when brought into the state for certain purposes. But if this is done, the rate of assessment and taxation is not uniform and equal. It was said in the case of *Hines v. City of Leavenworth*, 3 Kan. 200, that 'the whole property of the state must be listed and valued for taxation.' If this be true, must not all the property brought into the state after the first of March be listed for taxation in order to support the listing of part? Certainly a statute can not be sustained which attempts to cast the entire burden of taxation on one class of personal property, leaving all others exempt. If this be true in respect to the entire year, must it not be equally true in respect to a portion?

"We think this argument is sound, and that if in addition to the listing of all property present in the state on the first of March, an attempt is made to list property brought in after the first of March, it must apply to all property so brought in. No distinction can be made as to property after the first of March, any more than it can as to property on that day." (*Graham v. Comm'rs of Chautauqua Co.*, 31 Kan. 473, 477, 2 Pac. 549.)

In 1879 the legislature passed an act permitting a township trustee, with the advice and concurrence of the board of county

commissioners of his county, to levy taxes on the property of the citizens of his township for certain purposes. The act was held void because the tax did not apply to property in the township belonging to nonresidents and to persons or corporations not citizens of the township. In the opinion, delivered by Chief Justice Horton, the court said:

"Under the provisions of the statute the property in a township owned by non-residents and all persons or corporations not citizens is exempt from the taxes levied for township, road and other purposes. . . . If a state tax is levied upon property it must be uniform over all the state. If a county, town or city tax is levied upon property, it must be uniform throughout the extent of the territory to which it is applicable. It must also be extended to all property subject to taxation, so that all the property may be taxed equally. This is taxation by a uniform rule. We do not think that the taxes provided for in said subdivision 8 can be imposed upon the citizens of a township only. The taxes provided for should be levied upon all the property of a township, to comply with the constitution of the state. We are of the opinion, therefore, that the provisions of said subdivision 8, authorizing a levy of the taxes therein named on the property of citizens only, is unconstitutional; and that the taxes levied can not be collected." (*M. & M. Rly. Co. v. Champlin, Treas.*, 37 Kan. 682, 684, 16 Pac. 222.)

In 1899 the legislature passed an act to provide for the taxation of contracts of insurance made with insurance companies not authorized to do business in Kansas. Such contracts were to be taxed in a sum equal to ten per cent of the amount of premium paid or contracted to be paid thereon. The court held that the statute violated the rule of uniformity established by the constitution. In the opinion, written by the present Chief Justice, it was said:

"As will be observed, the constitution contemplates that there will be an assessment or valuation of the property to be used as a basis of the levy; and in this way equality and uniformity of taxation may be had upon all the property within the taxing district. Although assessment is the most important of all the steps in the imposition of taxes, no assessment or valuation is required by the act or made upon the property sought to be taxed in this case. 'It will be observed that the constitution does not in terms require that the property in the state should be taxed according to its value, but it must be apparent to every one that such was the intention of the constitution makers. Taxes can not be levied upon equal and uniform rate except upon the value.' (*Hines v. Leavenworth*, 3 Kan. 200.) To accomplish the uniformity and equality required by the constitution, it would appear that assessment or valuation is indispensable, and yet in this case the legislature, without assessment or valuation of the property, attempts to make an arbitrary exaction. All

other property in the state is required to be taxed at its true value in money, but here no account is taken of the solvency of the company or the value of the security or policy. However, values of other property may fluctuate or the rate of taxation thereon may change from year to year, no change is made in the tax levied on the property in question.

"The lack of uniformity is manifest in another way: One taxpayer has a policy written in the state by a company with authority on which no tax is imposed, while his neighbor has one written by an unlicensed company at Indianapolis, or other place outside of the state, which is subject to taxation. Taxes are uniform and equal when imposed on all property of the same character within the taxing district, and yet here the insured pays a ten per cent tax upon a policy written outside of the state, while his neighbor pays nothing on a policy of equal value and affording the same protection because it is written within the state. Contracts of insurance written outside of the state can not be regarded as illegal. Aside from the consideration that they may not be Kansas contracts and are therefore beyond the reach of the legislature, the act itself contemplates that such contracts may and will be made, and when made are to be treated as property within the state and become the subject of taxation here. This is an invidious discrimination, purposely made, and is a distinct departure from the constitutional rule of uniformity." (*In re Page*, 60 Kan. 842, 846, 58 Pac. 478.)

In 1897 the legislature passed a law relating to the taxation of personal judgments, section 1 of which reads as follows:

"The term 'personal judgments' shall include all personal judgments for money only, owned by residents and non-residents of the state of Kansas: *Provided*, this section shall not apply to judgments upon foreclosure of mortgages prior to the sale of the lands described in the decree, work and labor judgments or for material furnished in the erection of buildings, and improvements on land or lots. But shall apply to all personal judgments rendered upon foreclosure of mortgage after sale when a deficiency judgment remains against the judgment debtor." (Laws 1897, ch. 243.)

In the case of *Hamilton v. Wilson*, 61 Kan. 511, 59 Pac. 1069, the court, speaking through Justice William R. Smith, said:

"It is evident that the prescribed rule of uniformity has been disregarded in the discriminations made between different classes of judgments mentioned in section 1 of the act. It is quite certain that the law in question was passed for other purposes than the production of revenue. This, however, would be an immaterial consideration if the taxing power had confined itself within constitutional limits.

"We know by common experience that judgments on debts secured by mortgages are of much greater value than deficiency judgments for the same amounts remaining over after the property upon which they were liens has been exhausted. Yet under this law such valuable judgments are wholly exempted while judgments for deficiencies are taxed. Again,

it is difficult to furnish a reason why, under a tax law requiring uni-
formity and equality in its operation, a judgment for material furnished
in the erection of buildings should be exempted from taxation, while a
judgment rendered for money borrowed to purchase the material so used
should be taxed. Deficiency judgments remaining after the sale of real
estate upon foreclosure of mortgages are subject to be taxed; but any de-
ficiency arising on judgments in the case of the foreclosure of other liens,.
such as mechanics' or material men's liens, is wholly exempted. . . .
Under the above constitutional provision, the legislature has a narrow
latitude in exempting property from taxation, and the extent of its de-
parture from a uniform and equal rate of assessment and levy is marked
out and circumscribed in express terms. This constitutional provision is
to be regarded as a limitation on the power of the legislature to discrim-
inate between different classes or kinds of property when enacting tax
laws." (pp. 515, 516.)

The foregoing decisions, covering the period of the state's
history to the year 1900, are full, clear, consistent with each
other, and indubitably sound. The doctrine they announce
was the one with which the people were familiar when the
constitution was framed, and the work of the constitutional
convention consisted principally in stating the doctrine in suit-
able phraseology. The essentials are that each man in city,
county, and state is interested in maintaining the state and
local governments. The protection which they afford and the
duty to maintain them are reciprocal. The burden of support-
ing them should be borne equally by all, and this equality con-
sists in each one contributing in proportion to the amount of
his property. To this end all property in the state must be
listed and valued for the purpose of taxation, the rate of as-
sessment and taxation to be uniform and equal throughout the
jurisdiction levying the tax. The imposition of taxes upon
selected classes of property to the exclusion of others, and the
exemption of selected classes to the exclusion of others, con-
stitute invidious discriminations which destroy uniformity.
That the system works badly now is ground for change, but
the system having been established by the constitution as a
limitation on the power of the legislature, the constitution
must be changed before the system can be changed.

The often repeated declarations of the court that the consti-
tution requires all property of the state to be valued and taxed
at an equal and uniform rate had no reference to exempt prop-
erty. Equally positive declarations may be found that all
property in the state is not required to be assessed and taxed.

There is no inconsistency between the apparently conflicting statements. In one kind exemptions were not considered, in the other exemptions were taken into account.

The exemption provision of the constitution is a qualification of the rule of uniformity and equality. It is part of a compound sentence stating the rule and the exceptions, and commences with the adversative "but." All property belonging to certain classes is exempt absolutely from taxation, and personal property to the amount of at least $200 for each family is exempt. The power to exempt a greater amount of personal property for families is clearly implied, and power to make other exemptions is not expressly withheld. The first taxation act passed after the state was admitted to the Union (act of 1862, amending the territorial act of 1860) made other exemptions than those provided for in the constitution. The taxation act of 1868 did the same, and so far as known the power to make additional exemptions was not questioned until 1873. In that year the legislature passed an act exempting from taxation all notes, bonds, judgments, and evidences of debt secured by mortgages on real estate, and the mortgages themselves. The attorney-general rendered an opinion that the law was unconstitutional on two grounds: first, that the uniformity rule was violated, and second, that the specification of certain exemptions in the constitution implied the exclusion of others. The act of 1873 was repealed in 1874. When the subject came before the court it took the view which evidently prevailed when the people first commenced to regulate their governmental affairs according to the constitution, and held that the constitution prescribed a minimum exemption which may be enlarged according to the wisdom and discretion of the legislature. (*Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234; *Francis, Treas., v. A. T. & S. F. Rld. Co.,* 19 Kan. 303; *Sumner County v. Wellington,* 66 Kan. 590, 72 Pac. 216.)

Not only does this interpretation accord with the common understanding at the time the constitution was new, but it accords with a canon of interpretation more fundamental than that of *expressio unius est exclusio alterius.* The government of the United States is one of granted powers and must find a warrant of authority for all its acts in the constitution. The state governments possess all governmental power not denied

to them by the constitution, and in the absence of a prohibition expressed or necessarily implied they may take all reasonable measures for the promotion of the general welfare. This principle was applied in the case of *The State v. Durein,* 70 Kan. 13, 80 Pac. 987, holding that the amendment to the constitution prohibiting the manufacture and sale of intoxicating liquors except for specified purposes did not abridge the power of the legislature to adopt further prohibitory measures, and the principle has been applied in other cases.

The theory of the power of the legislature to make exemptions from taxation is bound up, however, with the constitutional theory of taxation. The principle of constitutional law referred to is in the final analysis a rule of interpretation to be resorted to in case of need. The framers of the constitution dealt with the subject of taxation and with the subject of exemptions according to definite views entertained with respect to each, and consequently an exercise of the power to make exemptions is conditioned by the constitution in two ways: first, by the express provision relating to uniformity and equality, and second, by the nature and purpose of the power itself.

The theory of exemption laws was stated in an opinion of the court, written by Mr. Justice Brewer, in the case of *Washburn College v. Comm'rs of Shawnee Co.,* 8 Kan. 344, decided in 1871:

"All property receives protection from the state. Every man is secured in the enjoyments of his own, no matter to what use he devotes it. This security and protection carry with them the corresponding obligation to support. It is an obligation which rests equally upon all. It may require military service in time of war, or civil service in time of peace. It always requires pecuniary support. This is taxation. The obligation to pay taxes is co-extensive with the protection received. An exemption from taxation is a release from this obligation. It is the receiving of protection without contributing to the support of the authority which protects. It is an exception to a rule, and is justified and upheld upon the theory of peculiar benefits received by the state from the property exempted." (p. 348.)

This theory is illustrated by the constitution itself. Property used for state, county, and municipal purposes is devoted directly to public-welfare ends, and taxes would have to be collected in some way to pay taxes assessed against such property. Property used for literary, educational, and scientific

purposes advances the intelligence of the people and saves the collection and expenditure of taxes for those purposes. Property used for religious purposes advances the morals of the people. Property used for benevolent and charitable purposes forestalls the maintenance of public charges by means of revenue derived from taxation. The family group, including children to be fed and clothed and educated, might be broken up unless there were preserved to it a modicum of property free from taxation. But in order that the uniform and equal rate of assessment might not be infringed the constitution limited the exemptions, other than that allowed to families, to property "used" and used "exclusively" for the purposes specified.

"The accumulation of large amounts of untaxed property, by educational, charitable, religious, and other institutions, is contrary to the fundamental rule requiring an equal rate of assessment and taxation; hence the constitution makes 'exclusive use,' and for a designated 'purpose' the test of exemption." (*Washburn College v. Comm'rs of Shawnee Co.*, supra, syl. ¶ 3.)

Besides this, an exemption from taxation, granted through favoritism or other arbitrary motive, of property not benefiting the public in any way different from other property of the state, could not be sustained even although the financial effect of the exemption might not be appreciably felt.

"It is difficult to conceive of a justifiable exemption law which should select single individuals or corporations, or single articles of property, and, taking them out of the class to which they belong, make them the subject of capricious legislative favor. Such favoritism could make no pretense to equality; it would lack the semblance of legitimate tax legislation." (1 Cooley on Taxation, 3d ed., p. 381.)

The case of *Comm'rs of Sedgwick Co. v. Bunker*, 16 Kan. 498, involved the taxation of real estate to pay bonds of the county in which the real estate originally lay after the real estate had been set off to a new county. Personal property of the new county was not taxed to pay the bonds. All real estate of the county issuing the bonds was permanently liable for their payment. Personal property was not so liable because it was removable at any time, and personal property coming into the new county after the partition was not liable at all. Uniformity and equality in discharging the burden of the bonds were not possible, and the court held that the legislative apportionment of the debt and the property between the

original county and the detached territory conformed as nearly as the circumstances would allow to the rule of uniformity and equality. Substantially the same question arose on the division of a township in Ottawa county, and was decided in the same way on the authority of the Sedgwick county case. (*Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234.) Dissatisfaction was expressed with the decision in the Sedgwick county case, and the opinion closes with the following statement:

"The only effect of this decision is, that it announces the principle that the legislature may when dividing a county or township relieve the personal property of the detached territory from all liability for previous debts of the county or township while continuing the liability of all the other property. Nothing else is decided." (p. 248.)

Another exceptional decision was rendered on a peculiar state of facts in the case of *Francis, Treas., v. A. T. & S. F. Rld. Co.,* 19 Kan. 303. The Santa Fe railway ran through a number of unorganized counties, which, for lack of organization, lacked machinery for the assessment and collection of taxes. Railroad property was assessed by the state board of railroad commissioners and consequently was taxed while other property in the unorganized counties escaped taxation. The court held the constitution was not violated. In the opinion it was said:

"It must be noticed that the maintenance of a county organization is attended with expense; that the non-organization is due to the lack of population; and, by implication, of property sufficient to justify, in the judgment of the legislature, the carrying of such a burden. It may well be presumed, that in these outlying portions of the state the expense of the machinery for collection would exceed the amount of taxes collected. Now in order to secure valid state taxation in the inhabited portions, must the state, at an expense exceeding the proceeds, extend its tax machinery out among the few settlers scattered over the plains in our western frontier? That would simply add to the burden of the settled portion of the state, and be but a sacrifice of the substance for the shadow. . . . The case has been before us for several months, and the subject of repeated consultations, and frequent examinations. The conclusions which we have reached are by no means entirely satisfactory to us. We hold the section to be constitutional and valid, not because it is clear to us that it is so, but because it is not clear to us that it is not." (pp. 310, 316.)

Little assistance in the elucidation of the constitution is afforded by any of these cases.

In the case of *Sumner County v. Wellington,* 66 Kan. 590, 72 Pac. 216, it was held that the waterworks plant owned and

operated by the city of Wellington was exempt from taxation and that the fact the city furnished water to its inhabitants and other consumers did not affect the exemption.    In the opinion it was said:

"The supplying of water to the inhabitants, while not strictly a governmental function, so much affects the health and welfare of the people as to be closely akin to it.   The plant was purchased with public funds; it is operated by the public officers and agents; and rentals derived from its operation go into the public treasury and are expended for the public benefit.   The ownership and the purpose being public, there are good reasons why the property should be exempted from taxation.   It is inconsistent with our theory of government to place a tax or burden upon one of the instrumentalities of government, and thus to impede its operation. . . . If use, rather than ownership, were applied as the test to the right of exemption, the result would be the same.   The fact that, in establishing and carrying on a system of water-works, the city furnishes water to citizens and consumers for rental charges, does not make it a mere business enterprise."   (pp. 591, 593.)

The same opinion contained the following discussion of constitutional principles:

"It will be noticed that the provision [of the constitution] quoted does not require that all property in the state shall be taxed, but does provide that all which is subject to taxation shall be assessed and taxed at a uniform and equal rate.   Certain exemptions are therein prescribed which the legislature can not ignore; but it does not forbid the exercise of the inherent power of the legislature to exempt property from taxation when in its judgment it may conduce to the public welfare. . . . Our constitution limits, rather than confers, power, and, hence, we look to it to see what it prohibits, instead of what it authorizes.   Unless the sovereign power of taxation, which includes the power to make exemptions, is actually prohibited by the constitution it may be exercised by the legislature.   In the absence of constitutional restrictions, the general rule is that the legislature has full power to grant exemptions from taxation, and, there being no such limitation, we can not say that property like that in question, owned by a city, may not be exempted by the legislature." (p. 593.)

In the opinion in the case of *The State v. Holcomb*, 85 Kan. 178, 116 Pac. 251, it was observed that the Sumner county case involved the right to tax the waterworks plant of a city of the state and that the language of the opinion should be read in the light of the question being treated.   The property involved was public property owned and used for public purposes, and the exemption was clearly of the same character as exemptions specified in the constitution.   No question arose as to the

extent to which the legislature may relieve from taxation entire classes of private property of great value, ordinarily looked to to supply a considerable portion of the necessary revenues of the state, and so impose the burden elsewhere; and it was not intended to intimate that the power to exempt property from taxation may be used in such a way as to introduce a system of taxation substantially different from that contemplated by the constitution. A warning against such use of the power was given in the opinion in the case of *National Bank v. Barber, Treas., &c.*, 24 Kan. 534, where it was said:

"This court has intimated that it is possible that the legislature may have the power to exempt from taxation personal property, in addition to that exempted by the constitution. (*Ottawa Co. v. Nelson*, 19 Kan. 237, 238; *Francis v. A. T. & S. F. Rld. Co.*, 19 Kan. 311, 312.) But this court has never intended to intimate or decide that real estate may be so exempted. And the bulk of all railroad property is real estate." (p. 546.)

The notion that property taxes might be abandoned and that public revenues might be raised by franchise, privilege, and occupation taxes, and other taxes of like kind, was not present in the minds of the framers of the constitution or of the people who adopted it. To their minds the property of the state was to be taxed as a matter of course, and all property was to be taxed according to its value, except that property which served the state in some peculiar way, whereby public benefits resulted equivalent to the benefits derived from taxes, might be exempted; but exemptions of this character could not be employed to build up large accumulations of untaxed property contrary to the fixed rule requiring a uniform and equal rate of assessment and of taxation.

The constitution does not limit the sources of revenue, and the legislature is left free to resort to subjects of taxation other than property. Passing beyond lands and goods and other tangible things, the legislature may exact a tribute or fee or tax on the enjoyment of conveniences, advantages, privileges, and other sources and means of benefit, emolument and profit. The broker, factor, commission merchant, or auctioneer may own nothing himself. The state should be compensated in some way for the protection afforded to the conduct of his business, and so a license is required of him. A number of individuals incorporate and secure the right to contract, hold property, and transact business as freely as an indi-

Wheeler v. Weightman.

vidual, without the disadvantages of a copartnership and with perpetual succession which avoids the legal consequences attending death. While the franchise is property in a certain sense and for certain purposes, the civil privilege enjoyed is quite distinct from the property of the corporation and is a legitimate subject of taxation. The right to take property by descent or devise is a valuable thing. It is not a natural right, but is a creation of the law, and may be conditioned as the legislature sees fit. A condition in the form of an inheritance tax is not a tax on the property which descends or which is disposed of by will, but is an excise on the devolution of the estate. Graduated taxes may be imposed on the probate of wills, grants of letters of administration, and even ordinary proceedings in court. The civil privilege of recording deeds, mortgages, and other instruments in public offices provided at the public expense is subject to taxation. Sources of revenue of this kind are not subject to valuation like property so that each person may pay a ratable proportion on an *ad valorem* basis and consequently discriminations and classifications may be made without infringing the constitutional rule of uniformity and equality, which applies to property taxes only. This court has so held in numerous cases, among which are the following: License taxes (*City of Leavenworth v. Booth,* 15 Kan. 627; *City of Newton v. Atchison,* 31 Kan. 151, 1 Pac. 288; *In re Martin,* 62 Kan. 638, 64 Pac. 43) ; registration taxes levied for purposes of regulation and not merely for revenue (*The State, ex rel., v. City of Topeka,* 36 Kan. 76, 12 Pac. 370) ; fees (*Beebe v. Wells,* 37 Kan. 472, 15 Pac. 565) ; poll taxes (*The State, ex rel., v. City of Topeka,* 36 Kan. 76, 12 Pac. 310; *Shane v. City of Hutchinson,* 88 Kan. 188, 127 Pac. 606) ; inheritance taxes (*The State, ex rel., v. Cline,* 91 Kan. 416, 137 Pac. 932) ; franchise taxes (*Railway Co. v. Sessions,* 95 Kan. 261, 147 Pac. 791) ; privilege taxes (*The State, ex rel., v. Sessions,* 95 Kan. 272, 147 Pac. 789).

The only limitations on the power to impose taxes of this kind are that the tax shall bear some reasonable relation to the right, privilege, or franchise taxed, that classification shall be natural and not arbitrary or capricious, and that all persons or subjects in the same class shall be treated in the same way. The character of the tax is not necessarily affected by the cir-

cumstance that it may be proportioned in the same way as the ordinary property tax. Thus license taxes required of merchants may be graduated according to the average amount of stock employed in business. (*City of Newton v. Atchison,* 31 Kan. 151, 1 Pac. 288.) If, however, the tax in fact rests on property, no matter what it may be called, it is a property tax, and courts will look through form to substance and will prevent that from being done by indirection which could not be accomplished directly.

Cases in which the courts have refused to stultify themselves respecting the true character of legislation and have pierced through speciousness to reality are numerous. In the case of *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S. 429, one of the questions was whether or not a tax on the rents or income of real estate was something different from a tax on the real estate itself, and consequently not a direct tax, which the constitution of the United States requires shall be apportioned among the several states. In the opinion it was said:

"The requirement of the Constitution is that no direct tax shall be laid otherwise than by apportionment—the prohibition is not against direct taxes on land, from which the implication is sought to be drawn that indirect taxes on land would be constitutional, but it is against all direct taxes—and it is admitted that a tax on real estate is a direct tax. Unless, therefore, a tax upon rents or income issuing out of lands is intrinsically so different from a tax on the land itself that it belongs to a wholly different class of taxes, such taxes must be regarded as falling within the same category as a tax on real estate *eo nomine.* The name of the tax is unimportant. The real question is, Is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes, and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. This law taxes the income received from land and the growth or produce of the land. Mr. Justice Paterson observed in *Hylton's case,* 3 Dall. 171, 'land, independently of its produce, is of no value;' and certainly had no thought that direct taxes were confined to unproductive land.

"If it be true that by varying the form the substance may be changed, it is not easy to see that anything would remain of the limitations of the Constitution, or of the rule of taxation and representation, so carefully recognized and guarded in favor of the citizens of each State. But constitutional provisions can not be thus evaded. It is the substance and not the form which controls, as has indeed been established by repeated decisions of this court. Thus in *Brown v. Maryland,* 12 Wheat. 419, 444,

it was held that the tax on the occupation of an importer was the same as a tax on imports and therefore void. And Chief Justice Marshall said: 'It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself.'

"In *Weston v. Charleston*, 2 Pet. 449, it was held that a tax on the income of United States securities was a tax on the securities themselves, and equally inadmissible. . . . So in *Dobbins v. Commissioners*, 16 Pet. 435, it was decided that the income from an official position could not be taxed if the office itself was exempt.

"In *Almy v. California*, 24 How. 169, it was held that a duty on a bill of lading was the same thing as a duty on the article which it represented; in *Railroad Co. v. Jackson*, 7 Wall. 262, that a tax upon the interest payable on bonds was a tax not upon the debtor, but upon the security; and in *Cook v. Pennsylvania*, 97 U. S. 566, that a tax upon the amount of sales of goods made by an auctioneer was a tax upon the goods sold.

"In *Philadelphia Steamship Co. v. Pennsylvania*, 122 U. S. 326, and *Leloup v. Mobile*, 127 U. S. 640, it was held that a tax on income received from interstate commerce was a tax upon the commerce itself, and therefore unauthorized. And so, although it is thoroughly settled that where by way of duties laid on the transportation of the subjects of interstate commerce, and on the receipts derived therefrom, or on the occupation or business of carrying it on, a tax levied by a state on interstate commerce, such taxation amounts to a regulation of such commerce, and can not be sustained, yet the property in a state belonging to a corporation, whether foreign or domestic engaged in foreign or domestic commerce, may be taxed, and when the tax is substantially a mere tax on property and not one imposed on the privilege of doing interstate commerce, the exaction may be sustained. 'The substance, and not the shadow, determines the validity of the exercise of the power.' *Postal Telegraph Co. v. Adams*, 155 U. S. 688, 698." (pp. 580, 582.)

In the case of *The State v. Kelly*, 71 Kan. 811, 81 Pac. 450, this court declined to sanction a deceptive piece of legislation which embarked the state upon the work of constructing, maintaining, and operating an oil refinery, a work of internal improvement, contrary to an express provision of the constitution, under the guise of providing facilities for caring for and employing inmates of the penitentiary.

The foregoing sufficiently develops, states, and illustrates all the principles necessary to a decision of the present controversy, and the act of 1915 may now be considered in the light of such principles.

No one could successfully contend that the constitution permits the legislature to exempt all real estate in the state from

taxation and so cast the burden of sustaining the government on personal property and other subjects of taxation. No one could successfully contend that all personal property in the state may be exempted from taxation, or that all property belonging to corporations, or to a class of corporations, like railroads, may be exempted from taxation. To do so would manifestly violate the rule of uniformity and equality. Yet the constitution itself provides that some real estate and some personal property shall be exempt, and contemplates that further exemptions may be made. Such exemptions must rest on the definite basis of promoting the public welfare in some peculiar and substantial way, and even then they can not be tolerated to the extent of building up large accumulations of favored property which would disturb general equality and uniformity. But where shall the line be drawn, and on which side of the line does the exemption of real-estate mortgages from taxation fall?

If common business experience furnishes any lamp for guidance in the future the mortgagor would pay the tax levied by the act of 1915. So far as results have been observed, tabulated, and analyzed it appears to be quite unlikely that the interest rate would be substantially affected. The argument from the exemption of municipal bonds is vitiated by the fallacy of "a factor overlooked," and it is quite unlikely that any great reservoir of capital, whose movements are controlled by economic forces and conditions not merely national but international in character and extent, would be drained into local real-estate mortgage basins by tinkering with local tax laws. So say careful investigators and economists of high qualification and repute. But the legislature may be of a different opinion. It may entertain a belief that its acts will in some way find exemption from the natural laws governing the business world and will be attended by unusually propitious consequences. It may believe that by a simple exemption statute it can correct a crying evil of our system of taxation and at the same time solve for this state the problem of rural credits which is now engaging the earnest attention of statesmen and publicists throughout the United States, including those states which now have mortgage exemption and mortgage registration fee laws. Who has knowledge that the

scheme is wholly chimerical? Its operation and results can not be positively determined in advance of a trial. The legislature is charged with the administration of the state's finances, and not the courts, and is the legislative plan so clearly beyond the warrant of the constitution that the legislature may not make the financial experiment and test the soundness of its views?

It is not inconceivable that a people having the information and the experience and imbued with the ideas and sentiments of those who voted for the adoption of the constitution would be amazed at a proposal to exempt from taxation an entire class of property now estimated to be worth $300,000,000, and by the very act of exemption to be enormously increased, which is owned chiefly by capitalists and money lenders. The constitutional fathers did not have in mind financial institutions like the mortgage-debenture companies contemplated by section 7 of the act, which will float their bonds in the money markets of the world on the basis of accumulations of untaxed mortgages. They did know about banks, and they inserted in the constitution a provision immediately following the one quoted and discussed above, which reads as follows:

"The legislature shall provide for taxing the notes and bills discounted or purchased, moneys loaned, and other property, effects, or dues of every description (without deduction), of all banks now existing, or hereafter to be created, and of all bankers; so that all property employed in banking shall always bear a burden of taxation equal to that imposed upon the property of individuals." (Const., art. 11, § 2.)

Banks are large holders of credits secured by real-estate mortgages, and if it had been anticipated that another class of money-lending institutions would be established side by side with banks is it not likely that section 2 would have been broadened to include them, so that all property employed in that business would bear a burden of taxation equal to that imposed on the property of individuals engaged in other pursuits? But if the state can be supplied with cheaper money by the scheme do not the public benefits to be derived from it bring it within the principle underlying exemption laws recognized by the constitution?

In the view the court takes of the law it is not necessary to give categorical answers to the foregoing questions.

The act is a revenue measure, and the tribute levied is a tax. The so-called registration fee bears no relation, proximate or

remote, to compensation for services performed or to the subject of reimbursing the state for its outlay in maintaining the office of register of deeds. The usual registration fee charged for these purposes must still be paid. The tax is computed at a per annum rate on the amount of the principal obligation secured as a basis of value. In the beginning the tax is paid for the years the mortgage runs. If the loan be extended at maturity the same per annum rate is paid for the period of the extension. While this is called a "renewal registration fee" there is no renewal of anything for any purpose for which records of instruments are kept. After maturity without an extension an annual tax is paid unless the debt be discharged or foreclosure proceedings be instituted. Exemption from *ad valorem* taxes and the right to have a mortgage enforced by judgment are secured, not by recording, but by paying the tax. The tax is distributed to the various funds in the treasury precisely as other taxes are distributed, and it has no office to perform except to augment the public revenues.

No general exemption from taxes is declared. A real-estate mortgage is still subject to *ad valorem* taxes unless the registration tax be paid, and the registration tax is a tax on the mortgage, which is property.

The act was patterned after the New York law of 1906, which was subsequently amended, and which in its amended form constitutes article 11 of the tax law of that state. (5 Consolidated Laws of New York, 1909, p. 4366.) The New York law is the more elaborate. The Kansas law differs from it in details, and contains provisions not found in the model, but the general scheme and the essence and substance of the two laws are identical and in some instances words employed in the same connection are identical. Not being obliged to contend with an obstruction in the form of a constitutional provision requiring a uniform and equal rate of assessment and taxation, the New York legislature frankly designated the imposition which it laid a tax, and a tax on mortgages. The following quotations are illustrative:

"A contract or agreement by which the indebtedness secured by any mortgage is increased or added to, shall be deemed a mortgage of real property for the purpose of this article, and shall be taxable as such upon the amount of such increase or addition." (§ 250.)

"All mortgages of real property situated within the state which are

taxed by this article and the debts and the obligations which they secure, together with the paper writings evidencing the same, shall be exempt from other taxation by the state, counties, cities, towns, villages, school districts and other local subdivisions of the state." (§ 251.)

"A tax of fifty cents for each one hundred dollars and each remaining major fraction thereof of principal debt or obligation which is, or under any contingency may be secured at the date of the execution thereof or at any time thereafter by mortgage on real property situated within the state recorded on or after the first day of July, nineteen hundred and six, is hereby imposed on each such mortgage, and shall be collected and paid as provided in this article. If the principal debt or obligation which is or by any contingency may be secured by such mortgage recorded on or after the first day of July, nineteen hundred and seven, is less than one hundred dollars, a tax of fifty cents is hereby imposed on such mortgage, and shall be collected and paid as provided in this article." (§ 253.)

"Whenever any mortgage other than a mortgage specified in section two hundred and sixty-four has been recorded prior to July first, nineteen hundred and six, the record owner thereof may file with the recording officer of the county in which the real property, or any part thereof, on which said mortgage is a lien, is situated, a written statement under oath verified by the record owner or the agent or officer of such record owner describing such mortgage by giving the date of the same and the *liber* and page of the record thereof together with the names of the parties thereto, specifying the amount then remaining unpaid on the debt or obligation secured thereby, and electing that it shall become subject to the tax prescribed by section two hundred and fifty-three of this chapter." (§ 254.)

"If subsequent to the recording of a mortgage on which all taxes, if any, accrued under this article have been paid, a supplemental instrument or mortgage is recorded for the purpose of correcting or perfecting any recorded mortgage . . . such additional instrument or mortgage shall not be subject to taxation under this article." (§ 255.)

"The taxes imposed by this article shall be payable on the recording of each mortgage of real property subject to taxes thereunder. Such taxes shall be paid to the recording officer of any county in which the real property or any part thereof is situated. It shall be the duty of such recording officer to indorse upon each mortgage a receipt for the amount of the tax so paid. Any mortgage so indorsed may thereupon or thereafter be recorded by any recording officer and the receipt for such tax indorsed upon each mortgage shall be recorded therewith. The record of such receipt shall be conclusive proof that the amount of tax stated therein has been paid upon such mortgage." (§ 257.)

"No mortgage of real property shall be recorded by any county clerk or register, unless there shall be paid the tax imposed by and as in this article provided. No mortgage of real property which is subject to the taxes imposed by this article shall be released, discharged of record or received in evidence in any action or proceeding, nor shall any assign-

ment of or agreement extending any such mortgage be recorded unless the taxes imposed thereon by this article shall have been paid as provided in this article. No judgment or final order in any action or proceeding shall be made for the foreclosure or enforcement of any mortgage which is subject to the taxes imposed by this article or of any debt or obligation secured by or which secures any such mortgage, unless the taxes imposed by this article shall have been paid as provided in this article." (§ 258.)

"When the real property covered by a mortgage is assessed in more than one county it shall be the duty of the state board of tax commissioners to ascertain the assessed value of the property in each county and to apportion the amount upon which the tax shall be paid to the recording officer in each of the said counties upon the basis of the relative assessments. . . . When the real property covered by a mortgage is located partly within the state and partly without the state it shall be the duty of the state board of tax commissioners to determine what proportion shall be taxable under this article by determining the relative value of the mortgaged property within this state as compared to the total value of the entire mortgaged property." (§ 260.)

The New York act of 1906 supplanted an act of 1905 which levied a tax of five mills on the dollar, uniformly throughout the state, on the legal and equitable owners of bonds, notes, coupons, or other evidences of debt or obligations secured by any mortgage of real estate and exempted the same from local taxation. In the case of *People v. Trust Co. of America,* 205 N. Y. 74, 98 N. E. 207, the court incidentally spoke of the tax under the act of 1905 as a property tax and the tax under the law of 1906 as an excise tax. The distinction, however, evidently referred merely to the method of apportionment, because the legislature of New York rested under no delusion respecting the character of the act of 1906. It intended to levy and in unmistakable terms did levy a tax on mortgages as property and left no room to interpret its action as directed merely toward the civil privilege of placing mortgages on record. That an excise tax may nevertheless be a property tax is made clear in an opinion delivered by Chief Justice Bigelow in the case of *Oliver v. Washington Mills,* 11 Allen (93 Mass.), 268:

"The words 'tax' and 'excise,' although often used as synonymous, are to be considered as having entirely distinct and separate significations, under the provisions of the constitution of Massachusetts, c. 1, § 1, art. 4. The former is a charge apportioned either among the whole people of the state, or those residing within certain districts, municipalities or sections. It is required to be imposed, as we shall more fully explain hereafter, so

that, if levied for the public charges of government, it shall be shared according to the estate, real and personal, which each person may possess; or, if raised to defray the cost of some local improvement of a public nature, it shall be borne by those who will receive some special and peculiar benefit or advantage which an expenditure of money for a public object may cause to those on whom the tax is assessed. An excise, on the other hand, is of a different character. It is based on no rule of apportionment or equality whatever. It is a fixed, absolute and direct charge laid on merchandise, products or commodities, without any regard to the amount of property belonging to those on whom it may fall, or to any supposed relation between money expended for a public object and a special benefit occasioned to those by whom the charge is to be paid." (p. 274.)

The statutes of Michigan, Minnesota and Oklahoma are framed according to the New York scheme. In Michigan and Oklahoma, as in New York, no constitutional impediment stood in the way. In Minnesota the constitution was amended to eliminate a provision similar to the equality and uniformity provision of the constitution of this state so that the scheme could be adopted. In Michigan, Minnesota and Oklahoma the legislatures resorted to no veiling device of phraseology, and the tax is known to be what it is in fact, a special tax on a class of property. The supreme court of Minnesota expressed itself on the subject as follows:

"There were good and sufficient reasons why a special method should be devised for the taxation of this kind of property. It is a notorious fact that the owners of securities in the form of bonds and notes have not been in the habit of paying their proportionate share of the taxes. This has been due in a measure to the ease with which the existence of such property can be concealed from the tax officials. But when the owner of a note takes a mortgage on real estate as security, and places it upon the public records, he exposes his ownership—at least, his ostensible ownership—and enables the assessor to reach him. The perfect security afforded by a good real-estate mortgage makes it necessary for the owner to accept a low rate of interest, and the adequate net returns, after paying taxes in the ordinary way, often result in practical confiscation. The owner is thus tempted to seek some devious method for escaping taxation, in order that he may be on an equality with the owner of an unsecured note or bond, which rests undiscovered in a safety deposit vault. The mortgage is therefore taken in the name of a nonresident, or the money is sent to another state, and there loaned in the name of the true owner. Experience has shown that it is very difficult, if not impossible, to fairly and successfully tax this kind of property under the system ordinarily applied to personal property. This practical difficulty alone furnishes a basis for a classification, and justifies the legislature in devising a special method for the taxation of the subjects of that class. To a certain extent the method provided in the statute under considera-

tion recognizes the justice of the claim that taxing mortgages according to the ordinary methods results in inequality and injustice, and constitutes a constant temptation to fraud whereby the honest and the innocent are made to suffer. By requiring a registration tax, every mortgage security pays a moderate tax, and this, in the judgment of the legislature, is preferable to the certain uncertainties of the old system." (*Mutual Benefit Ins. Co. v. County of Martin*, 104 Minn. 179, 182, 116 N. W. 572.)

The true character of these laws and the reason for their adoption were accurately and concisely stated in an opinion of the supreme court of Michigan, which reads as follows:

"The history of the adoption of this act is a matter of common knowledge. It is well claimed by relator that mortgages and like instruments had been concealed from assessing officers by putting them in the names of nonresidents, withholding them from record, and other familiar means, and it was urged that if a special tax could be imposed upon these instruments when they were recorded, and their foreclosure made dependent upon their having been recorded, and the tax made sufficiently low in amount, there would be an inducement to disclose mortgages to the assessing officer, rather than hide them as theretofore. With this end in view, the act was passed." (*Union Trust Co. v. Detroit Com. Council*, 170 Mich. 692, 696, 137 N. W. 122.)

Besides inducing persons who have been in the habit of employing methods to escape taxation to disclose their mortgage holdings, the legislature of this state hoped to attract more capital to the real-estate mortgage business. The court expresses no opinion regarding the soundness of the policy because it has no legal concern with the wisdom or unwisdom of legislative policies. The method adopted to carry out the policy, however, is the method of the property tax. The only marked difference between the statutes of the states referred to and the Kansas statute, barring matters of detail, is that in the latter the soothing term "registration fee" is used instead of the rude word "tax." The voice is the voice of crafty Jacob, but the hands are the hands of hairy Esau, and the court declines to be deceived by a name when it knows what everybody else knows, that the statute embodies a method now becoming common of taxing real-estate mortgages.

The state of Alabama has a mortgage registration tax law the material portions of which read as follows:

"7. A. No mortgage, deed of trust, contract of conditional sale, or other instrument in the nature of a mortgage, which is given to secure the payment of any debt which such mortgage, deed of trust, contract of conditional sale, or other instrument of like character, shall be executed

so as to convey real property or any interest in real property or personal property which is situated within this state, shall be received for record unless the following privilege taxes shall have been paid upon such instrument before the same shall be offered for record, to wit, upon all such instruments which are executed to secure any indebtedness which shall not exceed one hundred dollars, there shall be paid the sum of fifteen cents, and upon all such instruments which shall be executed to secure an indebtedness of more than one hundred dollars there shall be paid the sum of fifteen cents for each one hundred dollars of said indebtedness or portion thereof, which is secured by said mortgage, deed of trust, contract of condition of sale, or other instrument of like character, to be paid for by the lender.

"D. There shall be no *ad valorem* tax collected upon any such instrument, or the debts secured thereby, which shall have paid the tax prescribed by this subdivision, either state, county, or municipal." (1 Civ. Code of Alabama, 1907, § 2082, ¶ 7.)

In Alabama judges of probate are the recording officers. When a mortgage is presented for record the taxes are paid to him and he gives a certificate of such payment. He retains a percentage of the tax as remuneration for his services and distributes the remainder, part to the county treasurer and part to the state. If a mortgage cover land in more than one county the tax is divided between them. The legislature of Alabama called this tax a privilege tax. The supreme court of Alabama described the tax as one imposed for the privilege of recording mortgages (*State v. Alabama, Fuel & Iron Co.* [Ala. 1914] 66 South. 169) and it is a genuine privilege tax. The tax itself is very low, fifteen cents per hundred dollars no matter what the duration of the instrument. The collecting officer retains a part of the tax for his services. The inducement to record and pay the tax, besides the advantages secured by recording, consists in exemption from the usual *ad valorem* taxes, and a mortgage holder may withhold his instrument from record if he see fit, without any kind of coercion. Stated in another way, the privilege of recording a mortgage, which as property is subject to *ad valorem* taxes, is denied unless a small tax is paid. If the privilege be exercised an additional privilege is extended, that of exemption from *ad valorem* taxation; but the mortgage holder has a free choice to take or to renounce the privilege. If he renounce the privilege he loses nothing but the benefits it affords. He is not driven to swallow his "privilege" under pain of forfeiting

his security, as section 6 of the Kansas statute and corresponding sections of statutes like it require.

The state of Virginia lays a privilege tax on the registration of deeds, mortgages, contracts, and other instruments entitled to record. These taxes are distinct from ordinary property taxes. The supreme court of appeals of that state has properly held that this tax is not a property tax, but is a tax on the civil privilege of enjoying the benefits and advantages of the registration laws. (*Pocahontas Collieries Co. v. Com'lth,* 113 Va. 108, 73 S. E. 446.) The true character of the tax was illustrated in the case of *Saville v. Va. Ry. & P. Co.,* 114 Va. 444, 76 S. E. 954:

"No one is requiring the Virginia Railway and Power Company to spread this indenture upon the records. It is free to do as it pleases in that respect. It would not have executed the mortgage in the first place but that it desired, for its own advantage, to furnish the best security it could provide for the payment of its bonds and thereby to enhance their value upon the market. In furtherance of this purpose it sought the privilege of having its second mortgage spread upon the records of the Chancery Court of the City of Richmond, and for that privilege the state has seen fit to impose the tax which the clerk of that court demanded." (p. 452.)

No amount of metaphysical involution can harmonize the Alabama and Virginia laws with the Kansas law. When a contribution is levied as the price of a privilege a person may pay the price and enjoy the privilege or forego the privilege and avoid paying the price. The contribution is not exacted unless enjoyment of the benefits and advantages of the privilege is claimed. Take the case of *City of Newton v. Atchison,* 31 Kan. 151, 1 Pac. 288. The city levied a yearly license fee on merchants, measured by the value of the stock of goods carried. Atchison could pay the fee and enjoy the privilege of following his occupation as a merchant. He could reduce his stock and so reduce the amount of the fee, and he could dispose of his stock and so avoid payment of the fee altogether. But if the city had penalized these avenues of escape in such a way that it would have been utterly disastrous to turn to them, it would be nonsense to say, if he paid the fee, that he exercised a voluntary choice to pay in order that he might enjoy the privilege of merchandising. He would be paying an enforced contribution proportioned according to the value of his stock of goods, and

because it lacked even the shadow of a privilege to rest upon the contribution would be a pure property tax.

The statute under consideration assumed that a mortgagee would desire to give notice of his lien and protect his security by filing his mortgage for record. Bringing his mortgage to the register of deeds for record would disclose its existence and form a juncture for the operation of the tax law. So the privilege of recording was used as a stalking-horse and nothing more. But no chances were taken. The statute is utterly indifferent to the subject of spreading mortgages upon the county records. It is of no consequence under the statute whether the mortgage holder ever go near the office of the register of deeds or not. What the statute requires is that the mortgagee shall pay taxes on his mortgage to the county treasurer. Such payment entitles him to a ticket of admission to the register's office, which he may use or not at his pleasure. But he must pay the tax to the county treasurer under penalty of having every legal quality of his mortgage destroyed. Incidental to this destruction is a prohibition against receiving the instrument for record and recording it.

The form which the ordinary real-estate mortgage takes is familiar to all. It is not alone an instrument of ultimate security. Usually there are covenants accelerating the time of payment under certain conditions and increasing the rate of interest after default, and covenants relating to insurance, waste, the payment of taxes, the existence of prior liens and encumbrances, and defects in title. While the moral factor, the character and pecuniary circumstances of the mortgagor, may be considered, the mortgagee depends upon his mortgage to protect the money he lends. The striking down of the instrument as evidence of his rights and as the basis of a judgment of foreclosure whereby the money loaned may be collected can not be suffered by any prudent investor. Apart from and independent of any privilege to record, the mortgagee must pay the tax on his mortgage to prevent its emasculation. Consequently the registration fee is not the mere price of the privilege to register, but is a compulsory exaction levied for revenue purposes directly upon the mortgage as such, which loses its quality of evidence and security unless the tax be paid.

The result is that the statute undertakes to classify the prop-

erty of the state for purposes of taxation, to place real-estate mortgages, or, speaking accurately, some real-estate mortgages, in a class by themselves, and to subject such mortgages to a specific tax, all contrary to the express command of the constitution. This can not be done, and the statute is void.

The motion to quash is sustained.

## STATUTE.

### Chapter 250 of the Laws of 1915 reads:

Senate bill No. 680.

AN ACT relating to registration fees for, and taxation of, real estate mortgages.

*Be it enacted by the Legislature of the State of Kansas:*

SECTION 1. The words "real property" and "real estate" as used in this act, in addition to the definition thereof contained in the General Statutes of 1909, shall include all property, a conveyance or mortgage of which is entitled to record as real property or interest therein under the laws of this state. The words, "mortgage of real property" shall include every instrument by which a lien is created or imposed upon, or which affects the title to, real property, notwithstanding that the debts secured thereby may also be secured by a lien upon or interest in personal property. An executory contract for the sale of real estate, or a bond for a deed in which time is not made the essence of the contract, under which the grantee or vendee is entitled to the possession of such real estate, or by which the grantor holds the legal title as security for the unpaid purchase money, shall, for the purpose of this act, be treated as a mortgage of real property to secure the balance of the unpaid purchase price.

SEC. 2. Before any mortgage of real property shall be received and filed for record on and after the first day of July, 1915, there shall be paid to the county treasurer of the county in which such property, or a part thereof, is situated, a registration fee for each one hundred dollars, and major fraction thereof, of the principal debt or obligation which is, or under any contingency may be, secured by such mortgage, the sum of fifteen cents per annum for the full term of the loan; provided, that nothing in this act shall be construed as requiring a registration fee of more than $5,000 on any one mortgage of real property and such fee upon any such mortgage shall be paid at the time such instrument is presented for record and shall be paid in advance of it being recorded; and provided further, that mortgages given to building and loan associations as security for non-negotiable loans shall be exempt from the payment of the tax imposed by this act. The owner or holder of every such mortgage falling due after July 1, 1915, which is not paid at maturity, shall within six months immediately after the maturity of such mortgage, pay to the county treasurer of the county where it is recorded a renewal registration fee, on the amount remaining unpaid for the time renewed or extended, if renewed or extended, and if not renewed or ex-

tended, then for one year, equal to the fee required for a mortgage, for the same amount and time, executed on the date of such maturity; and in case such mortgage is not renewed or extended and remains unpaid, then at the expiration of the year for which the fee has been paid, a fee for the next year shall likewise be paid until such mortgage is paid in full; provided, that if an action is commenced in good faith for the foreclosure of any such mortgage, within six months after its maturity and prosecuted without unnecessary delay to final judgment, no such renewal registration fee shall be required. All renewal fees shall be apportioned and distributed in the same manner as the original registration fees. No fee shall be required in case a mortgage is given solely for the purpose of correcting or perfecting a previously recorded mortgage, or of providing additional security for the same indebtedness, where such registration fee has been paid on the original mortgage.

SEC. 3. The registration fees herein provided shall be in addition to the fees fixed by law for filing and recording such instruments. Upon payment of the registration fee to the county treasurer it shall be his duty to indorse upon the instrument presented a receipt for the payment of such fee, which shall be substantially in the following terms:

Registration fee amounting $———————
Paid this ——————— day of ——————— 191—
——————————————— Treasurer,
——————————————— County, Kansas.

The county treasurer shall number each instrument on which a registration fee has been paid, and keep in a book provided for that purpose a record of such number, description of the mortgage and the amount of the registration fee collected. All such fees shall be paid to the county treasurer under the provisions of this act and shall be apportioned by the county treasurer and credited to the various funds in the same manner as is the tax upon the real estate which is mortgaged.

SEC. 4. When a mortgage covers property situated in two or more counties, the registration fee herein provided shall be paid to the county treasurer of the county where it is first presented for record, and the county treasurer so receiving such fee shall apportion the same among the counties in which the real estate is situated in proportion to its assessed valuation and pay the same to the respective county treasurers. Should any contention arise as to the division and distribution of any registration fee, the same shall be referred to the state tax commission, whose decision shall be final.

SEC. 5. When the real property covered by a mortgage is located partly within and partly without this state, the state tax commission of Kansas shall determine what registration fee shall be paid, by determining the relative values of the mortgaged properties within and without the state, taking into consideration in so doing the amount of prior encumbrances upon such property or any part thereof. If a mortgage covering property partly within and partly without the state is presented for record, before such determination has been made by the state tax commission, there may be filed with the county treasurer a verified statement, in duplicate, made by the mortgagor or an officer or duly

authorized agent or attorney of the mortgagor, specifying the value of the property covered by the mortgage within and without the state, stated separately, one of which statements shall be transmitted by the county treasurer to the state tax commission. On such statements the registration fee to be paid shall be computed upon such proportion of the entire indebtedness secured by the mortgage as the vaule of the mortgaged property within the state shall bear to the total value of the entire mortgaged property as shown by such statements. The fees so paid to the county treasurer shall be retained by him until final determination by the state tax commission. The state tax commission shall thereupon, on not less than ten days' written notice, served personally or by mail upon the person making such statement and the mortgagee, proceed to determine what proportion of the principal indebtedness secured by the mortgage shall be used as the measure for the registration fees within this state, and shall also determine the proportion of the fees which shall be paid to the several county treasurers of the respective counties in this state in which mortgaged property is situated. A copy of such determination of the state tax commission shall be forthwith served upon the persons making such statement, upon the mortgagee, and upon the county treasurer to whom the fees were paid, together with the notice requiring the payment to the proper county treasurer, within ten days thereafter, of the amount of the registration fees required on such mortgage, if any remain unpaid as determined by said board. Such additional fees shall become due and payable at the expiration of ten days from the receipt of notice of the determination of the said tax commission. As soon as such fees are paid to the proper county treasurer he shall apportion and transmit the same to the several county treasurers of the counties where any of the mortgaged lands are situated as in other cases. The state tax commission shall adopt rules to govern their procedure and the manner of taking evidence in these matters, and may require certified statements to be furnished by county officers of the respective counties in relation thereto. A minute of the determination of the state tax commission in any such case shall be entered on the margin of the record of the mortgage where first recorded, by the register of deeds, on receipt of a statement of such determination from the county treasurer of his county.

SEC. 6. Any mortgage of real property, executed after July 1, 1915, on which the registration fee as herein provided has not been paid, shall not be filed for record, or recorded, by any register of deeds, neither shall such mortgage be received in evidence in any suit, action, or proceedings, nor shall any judgment or order for the enforcement thereof be made or entered in any court.

SEC. 7. All mortgages of real property executed after July 1, 1915, upon which the registration fees have been paid as provided in this act, as well as the debts and obligations which they were given to secure, and all mortgage-debenture notes or bonds, issued under existing statutes of the state, and registered with the state treasurer of the state of Kansas under such regulation as he may see fit to make, said registration stating that the said mortgage-debenture note or bond has been secured by a first mortgage that has been registered according to the provisions of this act

Wheeler v. Weightman.

and deposited with the said state treasurer, and that said mortgage bears a rate of interest not to exceed six per cent per annum and is a first lien against real estate in an amount not to exceed fifty per cent of the appraised valuation of said real estate, and after having been so registered and a flat registration fee of ten cents per hundred dollars paid into the state treasury, shall be exempt from taxation by the state, counties, cities, townships, school districts, and other municipalities of the state; but such exemption shall not apply to any mortgage which is not given in good faith to secure the debt therein described, but is given for the purpose of securing exemption from taxation upon the indebtedness described in the mortgage; and in such case any notes, bonds, or other obligations or indebtedness purporting to be so secured shall be subject to taxation the same as if such mortgage had not been given.

SEC. 8. All mortgages of real property executed prior to July 1, 1915, shall be taxable under the general tax laws of this state, provided that such mortgages shall be exempt from taxation upon the payment by the holder thereof to the treasurer of the proper county of the registration fees herein provided for mortgages executed on and after July 1, 1915, upon the amount of the debt thereby secured and remaining unpaid. Upon such payment the treasurer shall endorse his receipt of such fees upon the original mortgage and a memorandum thereof shall be made by the register of deeds upon the margin of the record of the mortgage; provided further, that before the owner of any note secured by real estate mortgage, or contract giving him a lien as security on real estate, executed prior to July 1, 1915, shall avail himself of the privileges of this act, he must pay all taxes which should have been paid by him on such note, mortgage or contract, prior to said date, had the same been properly listed as required by law.

SEC. 9. All acts and parts of acts in conflict with this act are hereby repealed.

SEC. 10. This act shall take effect and be in force from and after its publication in the official state paper.

Approved March 10, 1915.

Published in official state paper March 11, 1915.