Lantz v. Hanna.

No. 24,093.

J. B. LANTZ, *Appellant,* v. R. B. HANNA et al., *Appellees.*

SYLLABUS BY THE COURT.

TAXATION—*Provision of Section 11163, Gen. Stat. 1915, Relating to Taxation of United States Bonds Unconstitutional.* The portion of section 11163 of the General Statutes of 1915 which provides that, where bonds of the United States have been purchased during the year preceding March 1, a sum shall be listed for taxation as money on hand on March 1, computed by dividing the value of the bonds by twelve, and multiplying the quotient by the number of months of the year remaining after deducting the time the bonds were owned, violates the constitutional principles of equality and uniformity in property taxation in this state, denies purchasers of government bonds the equal protection of the laws guaranteed by the federal constitution, and violates the federal statute exempting bonds of the federal government from state taxation.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed June 10, 1922. Reversed.

*Ward Wright,* of Arkansas City, and *S. C. Bloss,* of Winfield, for the appellant.

*Richard J. Hopkins,* attorney-general, *E. W. Clausen,* assistant attorney-general, and *Ellis Fink,* county attorney, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover taxes paid under protest. A demurrer to the plaintiff's petition was sustained, and he appeals.

In this state, March 1 is taxing day. In March, 1919, the plaintiff duly listed for taxation all property subject to taxes which he owned on March 1. At that time he was operating for oil in Texas. His operations were financed by another, under an arrangement that he should receive a percentage of the net profits. On August 8, 1919, all property which the plaintiff was operating, including operating equipment, was sold, and he received, as his share of the profits, more than one million dollars. Anticipating the sale, the plaintiff had arranged to invest his prospective profits in bonds of the United States. On August 8, within a matter of moments after receiving his profits, he purchased First Liberty Loan bonds of the par value of one million dollars, for which he paid $997,200. In May, 1920, the assessor coerced the plaintiff to list his investment in

government bonds as of March 1, under section 11163 of the General Statutes of 1915, which reads as follows:

"All property shall be listed and valued as on the first day of March in the year in which the same is assessed, and the transfer or sale of any taxable personal property subsequently to the first day of March shall not authorize any person to omit the same from his list, although such list be not made until after the sale or transfer of such property; but all such property shall be listed for taxation in the same manner as if no sale or transfer thereof had been made. But where bonds of the United States have been purchased by any person during the year prior to the first day of March, where property is required to be listed as of that day, the value of such bonds in money shall be divided by twelve, and the quotient shall be multiplied by the number of months or fractional parts of months remaining after deducting the time which such bonds were owned, and such product shall be listed as money on hand on the first day of March by the party."

Having paid, under protest, the first half of the taxes levied pursuant to such listing, the plaintiff sued to recover the money, amounting to $7,446.65.

The plaintiff contends the statute deprives him of the equal protection of the law, contrary to the guaranty of the federal constitution, and violates the constitutional principles of equality and uniformity in property taxation in this state, by arbitrariness of classification.

When the constitution of this state was adopted, the theory of taxation was the theory of reciprocal protection and duty to support. (*Washburn College v. Comm'rs of Shawnee Co.*, 8 Kan. 344.) The theory which now prevails is the faculty theory. (*The City of Hutchinson v. Stewart*, 105 Kan. 743, 746, 185 Pac. 740.) The constitution stands in the way of full application of the modern theory, but the change in theory is not of practical consequence in this case. In the case of *Wheeler v. Weightman*, 96 Kan. 50, 149 Pac. 977, the court critically examined all cases previously decided, and stated the following conclusions respecting taxation of property:

"The essentials are that each man in city, county, and state is interested in maintaining the state and local governments. The protection which they afford and the duty to maintain them are reciprocal. The burden of supporting them should be borne equally by all, and this equality consists in each one contributing in proportion to the amount of his property. To this end all property in the state must be listed and valued for the purpose of taxation, the rate of assessment and taxation to be uniform and equal throughout the jurisdiction levying the tax. The imposition of taxes upon selected classes of property to the exclusion of others, and the exemption of selected classes to the exclusion of others, constitute invidious discriminations which destroy uniformity." (p. 58.)

In the same opinion the subject of exemption from taxation was fully considered, and the following conclusions were stated:

"An exemption from taxation, granted through favoritism or other arbitrary motive, of property not benefiting the public in any way different from other property of the state, could not be sustained even although the financial effect of the exemption might not be appreciably felt.

" 'It. is difficult to conceive of a justifiable exemption law which should select single individuals or corporations, or single articles of property, and, taking them out of the class to which they belong, make them the subject of capricious legislative favor. Such favoritism could make no pretense to equality; it would lack the semblance of legitimate tax legislation.' (1 Cooley on Taxation, 3d ed., p. 381.)" (p. 61.)

Within constitutional limitations, and limitations imposed by paramount federal law, the legislature has full discretion in the formulation of its scheme of taxation. Since the tax law must be a general law, perfect uniformity and equality are impossible, and it is unavoidable that some persons should be affected differently from others. In this instance, however, money invested in a single kind of tax-exempt security is taxed, while money invested in all other kinds is not taxed. The inequality is not incidental, but results from invidious discrimination between classes of tax-exempt securities, and between bonds of the United States and securities issued under the laws of this state, produced by revision of the tax law in 1907:

"No person shall be required to list for taxation any state, county, city, school-district and municipal bonds of the state of Kansas, or other evidences of indebtedness of municipal corporation[s] of this state." (Laws 1907, ch. 408, § 15, Gen. Stat. 1915, § 11302.)

There is no difference in principle between this case and the case of *Graham v. Comm'rs of Chautauqua Co.*, 31 Kan. 473, 2 Pac. 549, in which one kind of property, brought into the state after March 1, was taxed, while other kinds were not taxed; or the case of *M. & M. Rly. Co. v. Champlin, Treas.*, 37 Kan. 682, 16 Pac. 222, in which property of residents of a township was subjected to taxation, without taxing the property of others; or the case of *In re Page*, 60 Kan. 842, 58 Pac. 478, in which some insurance policies were taxed, and not others; or the case of *Hamilton v. Wilson*, 61 Kan. 511, 59 Pac. 1069, in which some kinds of judgments were taxed, and not others.

It is said the term "bonds of the United States" was used in a generic sense, and the state tax commission interprets the statute as

applying to all obligations of the United States. When the statute took effect (March 11, 1876), the term had a definite legal meaning, which accorded with its popular meaning, and applied to a single class of obligations. The legislature could not have been ignorant of the existence of the federal statute of 1864, which appears as section 3701 of the Revised Statutes of the United States (revision of June 22, 1874, published February 22, 1875). This statute distinguished between bonds and other obligations of the United States, and reads as follows:

"All stocks, bonds, treasury notes, and other obligations of the United States, shall be exempt from taxation by or under state or municipal or local authority."

Therefore, the interpretation of the tax commission is incorrect and, if applied, would amount to an amendment of the statute.

It is said money invested in securities of this state benefits the public in a different way from money invested in federal securities, and so becomes a proper subject of exemption. The theory of exemption is fully satisfied by relieving the state securities themselves from taxation, and there is no evidence of legislative intention to rest exemption of money invested in state securities the day before taxing day, on the ground the money is thus made of special service to the state. Conceding, however, money and securities virtually constitute a unit which is a proper subject of exemption, there can be no basis for discrimination between money invested in government bonds and money invested in other forms of federal securities. If money invested in state securities, and the securities themselves, are to be regarded as one fund for the purpose of exemption from taxation under state law, it is quite arbitrary to treat money invested in government bonds, and the bonds themselves, as distinct subjects of exemption under the federal law, and the plaintiff's contention that the statute purposely, but by indirection, taxes bonds of the United States contrary to the federal statute, must be sustained. The borrowing power of the United States depends on its ability to market its bonds. A tax on money invested in bonds of the United States, like a tax on the bonds themselves, "makes the possession of the bonds less valuable, it makes the net income from them less, it renders them less desirable as an investment, and consequently impedes and impairs the borrowing power of the federal government." (Gray on Limitations of Taxing Power and Public Indebtedness, § 755.)

It is said the supreme court of the United States has held contrary to the view just stated, in the case of *Shotwell v. Moore*, 129 U. S. 590.   In that case the court had under consideration a statute of the state of Ohio, the pertinent portion of which reads as follows:

"Sec. 2737.  .  .  .  sixteenth, the monthly average amount or value, for the time he held or controlled the same, within the preceding year, of all moneys, credits, or other effects, within that time invested in, or converted into, bonds or other securities of the ·United States or of this state, not taxed, to the extent he may hold or control such bonds or securities on said day. preceding the second Monday of April;  .  .  ." (p. 594.)

Shotwell was in the habit of withdrawing his bank deposit just before taxing day, taking greenbacks for the amount, and making a special deposit of the greenbacks until after taxing day.   In the opinion the court said:

"The state of Ohio, like many and perhaps most of the other states, collects from the business and property subject to taxation for the year preceding the specified date, the elements of an assessment of a tax to be paid by the taxpayer for the year succeeding that date, and it has in several instances recognized the fact that an assessment which assumed that all property should only be assessed to those who were the owners of it on the precise date named was not a just apportionment.  .  .  .

"To avoid this evil the statute in Ohio provides for the ascertainment of the monthly average amount or value of the property or goods in which such parties were dealing, and for the assessment for taxation on that basis.   Many kinds of business must be of this character.

"The legislature, perceiving the facility with which negotiable securities and other rights and credits which were liable to taxation might be exchanged for greenbacks at the time the assessment for taxation was made, and after the assessment was over replaced in the form in which they had been, applied this principle, by special provision of the statute, to that form of property.   In this they showed a wise forecast.   So far as we can see, the statute which does this does not tax the citizen for the greenbacks which he may have held at any time during the year, but taxes him upon the money, credits, or other capital which he has had and used, according to the average monthly amount he has so held.

"Such we understand to be the purpose and effect of the section complained of by counsel, to wit, subdivision sixteen of § 2737 of the Revised Statutes of Ohio.   We do not see any objection to that state endeavoring to arrive at the average monthly amount or value of the moneys, credits, or other effects of the citizen subject to taxation within the preceding year, and ascertaining in a similar manner the average amount of his securities, either state or national, for the same period, not subject to taxation, in order to fix a basis for assessment." (p. 598.)

It will be observed the Ohio statute was not discriminatory. As the supreme court of the United States said, it was "a wise and equitable law." It applied to money invested in tax-exempt securities of all kinds, federal and state, treated such money as part of the taxable property of the state, and used the amount of the securities as a factor in computing an average taxable value for the year. Under the Kansas statute, no money invested in exempt securities is taxed, except that invested in government bonds.

The effect of the statute on the sale of government bonds during the World War became a subject of importance. In the report of the proceedings of the sixth biennial conference convention of the tax commission and the county assessors of the state of Kansas, held at Topeka, December 10 and 11, 1917, appears the following:

"During the conference many questions were asked as to whether or not moneys invested in 'liberty bonds' were subject to the provisions of section 11163, General Statutes of 1915. Suggestions were made concerning the subject, with a reservation on the part of the Commission to give the matter careful consideration for the purpose of later announcing the rule to be followed.

"It was intimated by the commission at the time that it was very desirable to arrive at a conclusion that such moneys were not taxable, and since the conference adjourned the question has been taken up with the attorney-general, and it is with much satisfaction that, upon the advice of the attorney-general, it is now held that moneys invested in liberty bonds are not subject to the provisions of the said section.

"The conclusion is reached that the statute was enacted solely to prevent tax evasion on the part of owners of money who, on or about March 1, temporarily invested in ordinary government bonds for the purpose of being able to withhold from the assessment roll such moneys, and that moneys invested in the bonds now offered for sale in an emergency of the government, and known as liberty bonds, and which investments are made, not as investments for the purposes of income, but in a pure spirit of patriotism, to help the government out in its time of need, are not within the intent of the law." (p. 63.)

There is an intimation here that money used to purchase government bonds as an investment, may be taxed, and such now appears to be the view of the taxing officials. There is no reason to believe the statute was framed to prevent tax evasion. At the time the statute was enacted, the country was only beginning to recover from severe financial panic and business depression. Problems of currency and finance were agitating the country, and monetary heresies were rife. The paper-money volcano still smoked, and threatened eruption. The bondholder, who clipped coupons while others toiled,

Brown v. City of Nickerson.

was not popular. The national banking system, built upon government bonds, was under severe criticism. The long duel between gold and silver had commenced, and it was assumed it would be necessary to issue bonds to procure gold to make the resumption act effective. To maintain faith in the integrity of the government, interest on bonds, not specified as payable in gold, was paid in gold, which reached the price of 115 in 1876, and this fact served to increase resentment toward bondholders, as an unduly favored class. Tax evasion in this state by converting money into bonds of the United States, was negligible. The tax dodger resorted to greenbacks, which were exempt from taxation until 1894, and the legislature of Kansas believed it had discovered a method of reaching bondholders, by taxing money invested in bonds. The legal effect was to penalize investments in bonds of the United States.

The result is, the money which the plaintiff invested in liberty bonds was not taxable, and the taxes he was compelled to pay should be refunded.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment in favor of the plaintiff.