No. 34,359

JOHN L. HUNT, *Plaintiff*, v. O. B. EDDY, County Assessor of Shawnee County, *Defendant*.

(90 P. 2d 747)

Opinion filed May 22, 1939.

*John L. Hunt,* pro se, *Marlin S. Casey, Lester M. Goodell* and *Margaret McGurnaghan,* all of Topeka, for the plaintiff.

*Robert C. Foulston, John F. Eberhardt,* both of Wichita, *D. C. Hill,* of Wamego, *W. G. Fink,* of Fredonia, *Lester Luther,* of Cimarron, *Frank Theis,* of Arkansas City, of the State Tax Commission, *Austin M. Cowan, C. A. Mc-Corkle, W. A. Kahrs, Robert H. Nelson, Henry L. Butler* and *Ellis D. Bever,* all of Wichita, as *amici curiae.*

The opinion of the court was delivered by

WEDELL, J.: This is an original proceeding in mandamus to compel the county assessor of Shawnee county to tax according to the intangible rate five shares of common stock of the American Telephone Company owned and listed for taxation by plaintiff, rather than according to the ad valorem rate applied by the defendant.

The pertinent portion of the motion for the alternative writ in substance alleged: Defendant altered plaintiff's tax statement in which the shares of stock here involved were listed by plaintiff for taxation in such manner as to classify the shares of stock as personal property, which bears the ad valorem rate, instead of leaving

them as listed by plaintiff and as contemplated by the State Tax Commission, namely, under the heading of "moneys and credits," so as to bear the intangible rate; plaintiff perfected an appeal to the State Tax Commission, which found plaintiff had properly returned the shares of stock for taxation at the intangible rate and it ordered defendant to accept the return as originally made; defendant refused to comply with the order.

The motion for the writ further alleged:

"3. . . . Plaintiff is informed and believes that under Senate bill No. 227 certificates evidencing shares of stock in corporations which do not have their principal office in Kansas are 'notes and other evidences of debt' and taxable at the rate of five mills per dollar of valuation.

. . . . . . . . . . . . .

"5. At the time of the adoption of the amendment to section 1, article 11 of the constitution, the members of the committee of the House and Senate which submitted the amendment understood that certificates evidencing stock in corporations which did not have their principal office in Kansas were an 'other evidence of debt'; and plaintiff is informed and believes that said amendment was voted upon by the electors of this state with the same understanding. (In support of this averment the affidavit of a member of the committee referred to is offered.)

"A number of trusts have been formed outside of the state, so that the certificates of stock herein referred to have a business situs and do not pay taxes in this state, for the reason that it is an exceptional stock in a foreign corporation which pays more than a four-percent dividend, and a tax of four percent or more makes it impossible to carry such certificates of stock."

Defendant has demurred to the motion and has moved to quash the alternative writ on the ground it fails to state facts sufficient to constitute a cause of action, and for the reason Senate bill No. 227 is unconstitutional.

The principal purpose of this proceeding is to test the constitutionality of Senate bill No. 227, enacted during the 1939 legislative session. The constitutional provision involved is the constitutional amendment of 1924, contained in section 1, article 11, popularly— although not entirely accurately—referred to as the intangible tax amendment. It provides:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, *except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature shall provide.* All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and personal property to the amount of at least two hundred dollars for each family, shall be exempted from taxation." (Italics inserted.)

Senate bill No. 227 reads:

"SECTION 1. Section 79-3108 of the General Statutes of 1935 is hereby amended to read as follows: Sec. 79-3108. That for the purpose of taxation the term 'money' shall mean and include gold and silver coin, United States treasury notes, and other forms of currency in common use. The term 'notes and other evidences of debt' shall include and mean *certificates evidencing shares of stock otherwise taxable to the owner or holder,* notes, bonds, debentures, claims secured by deed, liquidated claims and demands for money, and all written instruments, contracts or other writings evidencing, calling for, fixing or showing a fixed obligation, determined or determinable, at present or in the future, in favor of the holder thereof."

The only change in G. S. 1935, 79-3108, is the addition of the italicized portion of Senate bill No. 227. The 1939 legislature clearly intended by its amendment of G. S. 1935, 79-3108, to make "shares of stock otherwise taxable to the owner or holder," taxable at the intangible rate. This result it sought to accomplish by classifying for taxing purposes such shares of stock as "evidences of debt." That classification clearly appears to have been the result of a definite legislative policy designed to advance the public interest. It appears to have been the judgment of the lawmakers that by the application of the lower rate, the intangible rate, to such shares of stock the state could and would better succeed in bringing those shares of stock onto the tax rolls and thereby materially augment the total revenue collected from this particular class of property. In the wisdom of that legislative policy the members of the State Tax Commission unanimously concur. No principle of law is more firmly established in our system of jurisprudence than the principle that the lawmakers possess the sole authority to determine what legislative policies will advance the public interest. Such policies present questions of statecraft and are determined by the legislative branch of government, and not by the courts. (*Kansas Gas & Elec. Co. v. City of McPherson,* 146 Kan. 614, 72 P. 2d 985; *Clinton v. State Tax Commission,* 146 Kan. 407, 409, 71 P. 2d 857.) Courts are concerned only with the validity of the enactment.

Does the constitution clearly prohibit the classification of shares of stock for taxing purposes? If it does that ends this lawsuit. If it does not clearly prohibit such classification, then is Senate bill No. 227 fatally defective by reason of the fact it classifies "shares of stock otherwise taxable to the owner or holder," as "evidences of debt"?

It is fundamental that our state constitution limits, rather than

confers powers. Where the constitutionality of a statute is involved, the question presented is, therefore, not whether the act is authorized by the constitution, but whether it is prohibited thereby. (*Lemons v. Noller*, 144 Kan. 813, 63 P. 2d 177.) For the purpose of determining whether legislation is prohibited by the organic law, courts are guided by well-established principles. At the threshold of the inquiry courts start with the presumption the lawmakers intended to enact a valid law, and to enact it for the accomplishment of a needful purpose. Just as important is the equally well-grounded doctrine that ·if there is any reasonable way to construe the law as constitutionally valid, instead of invalid, courts must uphold the law. (*State, ex rel., v. Board of Education*, 137 Kan. 451, 453, 21 P. 2d 295; 11 Am. Jur., Constitutional Law, § 61.) A statute and pertinent constitutional provisions must be construed together with a view to make effective legislative intent rather than to defeat it. (*State, ex rel., v. Anderson*, 114 Kan. 297, 301, 217 Pac. 327.)

In the instant case the legislative intent in the 1939 law is clear. Does the 1924 constitutional amendment prohibit the legislature from making effective that intent? The answer requires that we ascertain, as nearly as possible, the true purpose and intent of the constitutional amendment. That means the intention of both the framers and the adopters of the amendment. In determining their true intent courts are not restricted and limited by a mere technical *interpretation* of the exact words employed, but are required to place upon the constitutional provision involved a *construction* which will take into account the attendant circumstances, such as the mischief sought to be remedied, if such considerations will assist them in arriving at the real intent of the framers and adopters. (12 C. J., Constitutional Law, § 35.) In 11 Am. Jur., Constitutional Law, § 61 and § 62, the rule is stated thus:

"The fundamental principles of constitutional construction is to give effect to the intent of the *framers* of the organic law and *of the people adopting it.* A constitutional clause must be construed reasonably to carry out the intention of the framers, which gives rise to the corollary that it should not be construed so as to defeat the obvious intent if another construction equally in accordance with the words and sense may be adopted which will enforce and carry out the intent. The intent must be gathered from both the *letter and spirit* of the document.

"It has been very appropriately stated that the polestar in the construction of constitutions is the *intention* of the *makers* and *adopters.*

"Wherever the purpose of the framers of a constitution is clearly expressed, it will be followed by the courts. Even where terms of a constitutional pro-

vision are *not entirely free from doubt,* they must be interpreted as nearly as possible in consonance with the *objects and purposes in contemplation at the time of their adoption,* because in construing a constitutional provision, its general scope and object should be considered." (§ 61.) (Italics inserted.)

"The familiar rule, as to the interpretation of changes in statutory law, that an inquiry should be directed to the *old law, the mischief, and the remedy* has frequently been applied in the interpretation of constitutional provisions. Constitutions are to be construed in the light of their purpose and should be given a *practical interpretation,* so that the plainly manifested purpose of those who created them may be carried out. In other words, a constitutional provision should not be construed so as to defeat its evident purpose, but rather so as to give it *effective operation and suppress the mischief at which it is aimed. . . .*" (§ 62.) (Italics inserted.)

It is a well-established principle that for the purpose of arriving at the true purpose of an amendment and to make that purpose effective courts are not permitted to apply a technical construction to words employed. (12 C. J., Constitutional Law, § 43.)

With these principles in mind let us first examine the real intent of the framers, the lawmakers, at the time they submitted the amendment to the people for adoption. What mischief did they intend to suppress by the amendment? We must and do assume they were familiar with the decision of this court in *Wheeler v. Weightman,* 96 Kan. 50, 149 Pac. 977, and others in which this court frankly recognized the fact that the old constitutional provision had outlived its usefulness and barred the pathway to the establishment of an equitable system of taxation through the classification of property, but that this court was bound by the constitutional provision requiring uniformity and equal rate of assessment and taxation as to all property. The framers of the amendment therefore sought authority from the people to classify various kinds of property for the purpose of taxation and to tax that property uniformly, as to class, as they should provide. Did they understand that shares of stock were intended to be embraced within the authority of the amendment to classify? In order to make the inquiry more specific, in its application to the instant case, let us see whether the *framers* of the amendment believed it *prohibited* them from classifying "foreign stocks" as evidences of debt, or did they understand it *authorized* them to classify "foreign stocks" so as to make them taxable at the intangible rate? That answer seems clear. The resolution to submit the amendment to a vote of the people was framed by the legislature of 1923. (Laws 1923, ch. 255.) The journals of the legislature disclose the leadership in the legislative session of

1925, that being the first session following the adoption of the amendment, was largely the same as that which framed the amendment in 1923. In 1925 the legislature enacted a law which made "foreign stocks" taxable at the intangible rate. (Laws 1925, ch. 277.) The same legislature amended section one, chapter 277, pertaining to moneys, but did not amend section two, chapter 277, which makes "foreign stocks" as credits taxable at the intangible rate. (Laws 1925, ch. 278.) In 1927 the legislature repealed both chapters 277 and 278, Laws of 1925, but again defined credits as including "foreign stocks," and made them taxable at the intangible rate. (Laws 1927, ch. 326.) The 1927 law was repealed March 8, 1930. (Laws 1930, ch. 18, Special Session.) That repeal, in all probability, was prompted by the decision of this court in *Voran v. Wright,* 129 Kan. 1, 281 Pac. 938, and by the opinion on the rehearing of that decision on February 8, 1930 (129 Kan. 601, 284 Pac. 807), in which latter opinion it was indicated shares of stock did not constitute evidences of debt. It will, however, be well to also bear in mind that the case of *Voran v. Wright,* supra, and the case of *Stevenson v. Metsker,* 130 Kan. 251, 286 Pac. 673 (the latter being decided on March 19, 1930), both involved the taxation of shares of stock in state banks, and that the basis of the decision, in at least the Stevenson case, was that the tax on such stock was based on intangibles, and that *intangibles were classifiable under the 1924 constitutional amendment,* and that the intangible rate was applicable. The Stevenson case pointed out that shares of stock in state banks were assessed essentially on the basis of the intangibles of the corporate entity. In the early part of the 1931 legislative session a new law was enacted which again provided:

"The term 'notes and other evidences of debt' shall include and mean *shares of stock in corporations, which shares are assessed in relation to and in lieu of the intangible assets of such corporations or associations,* bonds . . . ." (Laws 1931, ch. 311, § 1.) (Italics inserted.)

Later in the same legislative session, section one of that law was amended and the italicized portion thereof was omitted. (Laws 1931, ch. 312, which was G. S. 1935, 79-3108, and remained in effect until amended in 1939 by Senate bill No. 227.) This last act is another attempt to tax "shares of stock otherwise taxable to the owner or holder" at the intangible rate.

These persistent legislative attempts to tax shares of stock at the intangible rate are attendant circumstances which throw much light

upon the intention of the framers of the amendment, also upon the interpretation by subsequent legislatures of the intention of the adopters of the amendment. That the 1924 constitutional amendment is commonly referred to as the "intangible tax amendment" is common knowledge. The compiler of the General Statutes of 1935, in classifying the various acts, lists article 31 as "mortgage registration and intangibles," and lists G. S. 1935, 79-3108, as the "intangible" statute. That this court itself has referred to the statutes enacted pursuant to the constitutional amendment as "the intangible laws" is not open to conjecture. (*Voran v. Wright*, 129 Kan. 1; 281 Pac. 938; id., 129 Kan. 601, 602, 284 Pac. 807; *Stevenson v. Metsker*, 130 Kan. 251, 252, 260, 262, 286 Pac. 673.) The gist of the decision in each of those cases was that shares of stock in state banks, under our law, were not taxed at their true value but essentially upon the intangibles of the corporate entity. (See Laws 1925, ch. 276, § 1, and *Stevenson v. Metsker*, supra, p. 261.) It was definitely determined in the Stevenson case that the 1924 constitutional amendment authorized the classification of intangibles, and that shares of stock in state banks were taxable at the intangible rate. In the Stevenson case it was held:

"Shares of *state bank stock* assessed to shareholders take the intangible rate of taxation because, disregarding form and regarding substance only, the foundation for the tax burden which shareholders must bear consists essentially of *intangibles which are classifiable under the amended constitution,* and which have been classified and *given a low rate by the legislature.* . . ." (Syl.) (Italics inserted.)

In the course of the opinion it was said:

"The amendment was adopted by a vote of 250,813 for, to 196,852 against. Under authority of the amendment the legislature enacted the mortgage-registration law, the *intangible-tax* law, and the secured-debts law, providing for low rate of taxation on classified property, which, for convenience, will be called the *intangible rate.* In the case of *Voran v. Wright,* 129 Kan. 601, 284 Pac. 807, the court decided, in substance, that shareholders in state banks were entitled to the benefit of the *intangible rate,* and plaintiff's contention is based on his interpretation of the effect of that decision.

"The problem for solution in *Voran v. Wright* involved application of the *intangible rate* in taxation of shares of state bank stock." (p. 252.) (Italics inserted.)

    .    .    .    .    .    .    .    .    .    .    .

"As stated above, the constitution was amended, and the *intangible-tax laws* were enacted." (p. 256.) (Italics inserted.)

"In taxation we penetrate to essence; and if, in final analysis, that which is assessed and taxed consists intrinsically of intangibles, the burden of taxation may not be made greater by sticking in the bark of terminology." (p. 260.)

"Since by going to the bottom of the matter we find that the ultimate subject of taxation is intangibles, reached for taxation through shareholders, it is not material that a share of bank stock, regarded simply as a share of bank stock, is not mineral, nor money, nor mortgage, nor note, nor evidence of debt." (p. 262.)

In a carefully considered dissenting opinion in the Stevenson case, Mr. Justice Harvey, after analyzing the constitutional amendment, said:

"There is, therefore, no ground for the view which seems to permeate the opinion of the court in this case that *by this amendment* the legislature was authorized to classify and separately tax *intangible property*." (p. 280.) (Italics inserted.)

In view of that dissenting opinion it is manifest the question of whether the amendment authorized the classification of intangibles was thoroughly considered, and that a majority of this court concluded the amendment did authorize the classification of intangibles. In the absence of any constitutional definition of intangibles, we know of no valid reason why the legislature may not regard shares of stock as intangibles for taxing purposes. The framers of the amendment intended by the amendment to make intangibles classifiable for taxing purposes. Subsequent legislatures construed the amendment as authorizing the classification of intangibles for tax purposes. This court has construed it likewise. In view of these facts, shall we now strike down Senate bill No. 227 by saying the adopters of the amendment were wrong in assuming the amendment was intended to authorize such classification? Obviously not. True, the Voran and Stevenson cases involved stock in state banks, while the stock here involved is stock in a foreign corporation. Certainly we shall not say the adopters of the amendment should have regarded the former as taxable, under the amendment, at the intangible rate and the latter at the tangible rate. The constitutional amendment simply will not permit of such a distinction. It inevitably follows that so far as the constitution is concerned, stocks in foreign corporations are classifiable for taxing purposes, as well as other stocks. Any certificate of stock in a corporation, whether foreign or domestic, represents something distinctly intangible. The actual worth of stock does not inhere in the piece of paper called a certificate, but in the corporate attributes behind it and in whatever

else may for the time being contribute to its market value. Intangibles are either classifiable generally under the amendment or they are not classifiable at all. The amendment in no wise refers to intangibles as such, but this court has definitely construed the amendment as authorizing their classification.

We may, therefore, proceed in the instant case upon the theory the framers and adopters of the amendment were also justified in the presumption the amendment permitted the classification of intangibles for taxing purposes. Shall we then defeat the plain legislative intent of Senate bill No. 227, to tax intangibles, the shares of stock here involved, at the intangible rate? If we defeat that intent we must do so upon the basis of a strictly technical and legalistic meaning of the words "evidence of debt" contained in the constitution. We readily concede that according to the processes of refined judicial research an ordinary certificate of stock is not technically an "evidence of debt," but rather a certificate evidencing the ownership of a unit of a corporate entity. (*Voran v. Wright,* supra, p. 612; *Ryan v. State Tax Commission,* 132 Kan. 1, 4, 294 Pac. 938; *Citizens Bank v. State Tax Commission,* 132 Kan. 5, 14, 294 Pac. 940.) Can we, however, say the mass of our people who adopted the amendment made that fine, legalistic distinction? Unless, beyond a reasonable doubt, we can answer that question in the affirmative the instant law must be upheld. (*State v. Sherow,* 87 Kan. 235, 239, 123 Pac. 866.) Statutes should not be declared unconstitutional unless the infringement of the superior law is clear beyond substantial doubt. (*Comm'rs of Wyandotte County v. Abbott,* 52 Kan. 148, 34 Pac. 416; *State, ex rel., v. Hardwick,* 144 Kan. 3, 5, 57 P. 2d 1231.) All presumptions are indulged in favor of the validity of a law, and doubts as to constitutionality are always resolved in favor of constitutionality. (*Johnson v. Reno County Comm'rs,* 147 Kan. 211, 216, 75 P. 2d 849.) Before a statute can be declared invalid its unconstitutionality must clearly appear. (*State, ex rel., v. Hardwick,* supra, p. 4.)

In construing constitutional provisions courts do not strike down legislative enactments upon the mere ground they fail to conform with a strictly legalistic definition or technically correct interpretation of constitutional provisions. The test is rather whether the legislation conforms with the common understanding, the true intention, of the people at the time they adopted the constitutional provision. The interpretation should be that which the great mass

of the people themselves would give it. (*Mills v. Porter et al.*, 69 Mont. 325, 222 Pac. 428, 35 A. L. R. 592.) The presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopt them. (12 C. J., Constitutional Law, § 48.) The constitution is not to be construed in a technical manner, but in ascertaining its meaning the courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it. (*Bonsal v. Wellott*, 100 Md. 481, 60 Atl. 593, 69 L. R. A. 914.) In 11 Am. Jur., Constitutional Law, § 65, the rule is stated thus:

"Even though the language may seem to be clear in its meaning, many questions arise where a word which would otherwise be unambiguous has two or more separate and distinct meanings or connotations. In such a situation a question of construction exists, for it must be determined which of the possible meanings of the term is intended. Words or terms used in a constitution, being dependent on ratification by the people voting upon it, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in interpreting statutes and acts of the legislature." (§ 65.)

In *State v. Sessions*, 84 Kan. 856, 115 Pac. 641, it was held:

"A constitution must be interpreted liberally to carry into effect the principles of government which it embodies. It deals broadly with general subjects, and its language should not be interpreted in any narrow, refined or subtle sense, but should be held to mean what the words imply to the common understanding of men." (Syl. ¶ 1.)

In the opinion the court quoted, with approval, as follows:

"'Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss.' (1 Story on the Const., 5th ed., § 451.)" (p. 862.)

A majority of this court are not convinced beyond a reasonable doubt that the man on the street, the lay mind, did not regard a "certificate evidencing shares of stock" as an "evidence of debt." It seems to us there is a strong possibility or probability that he may have regarded certificates of stock, bonds or securities, as constituting "evidences of debt," and as being intended to belong to the same general class of instruments as notes and mortgages. At any

rate, to us it does not clearly appear he did not so regard them. We think it fair to say the average man thinks of certificates of stock and securities in much the same way. He probably uses the words synonymously. The definition of the word "security" in Webster's New International Dictionary, unabridged, second edition, 1935, will probably more nearly conform to the notions of the average man than a technical legalistic definition. It reads:

"Security: . . . Chiefly *pl*, An evidence of debt or of property, as a bond, stock certificate, . . ." ·

Our own speculative securities law, commonly referred to as the "blue-sky law," defines "securities" as follows:

"'Security' shall mean and include any stock, share, bond, note, contract, debenture, investment contract, evidence of indebtedness, . . ." (G. S. 1937 Supp. 17-1223 [3].)

In the early case of *Culp v. Mulvane*, 66 Kan. 143, 71 Pac. 273, this court said:

"*Certificates of stock are frequently spoken of as securities,* but they are not such, in the proper signification of the term." (p. 152.) (Italics inserted.)

The italicized portion of the statement is our own judicial interpretation of the layman's view. It is his view with which we are now primarily concerned. The unitalicized portion is the technical, the legalistic view, with which we are not now primarily concerned.

In 14 C. J., Corporations, § 512 (4), is contained the following:

"Strictly speaking, a share of stock is not, like a note, a chose in action, but it is analogous to, and in the nature of, a chose in action and has repeatedly been so classified."

Mr. Justice Hughes, in *Hawley v. Malden*, 232 U. S. 1, 58 L. Ed. 477, said:

"While the shareholder's rights are those of a member of the corporation entitled to have the corporate enterprise conducted in accordance with its charter, they are still in the nature of contract rights or *choses in action.*" (p. 12.) (Italics inserted.)

A note writer in 30 Harvard Law Review, 487 (1917) in dealing with the interesting subject of "jurisdiction to adjudicate the ownership of a share of stock," wrote as follows:

"Perhaps the most logical explanation of the nature of a share of corporate stock in our law, and the one most commonly accepted, is that *the share of stock is a chose in action of a complicated character—an obligor-obligee relation between the corporate entity and the shareholder.*" (p. 487.)

"A corporate share is a very complicated chose in action. It is not a right

to a definite sum of money, but rather to a proportionate share of the assets of the company, whatever they may be, upon dissolution. There are in addition certain incidental rights and duties appended to the relation. Again, the stock is represented by a certificate, often negotiable, a mercantile specialty, which is generally in current use in commercial transactions.

"First, as to the fact that the chose in action is not for a definite amount, and as to the added rights and duties. *None of these change the essential obligor-obligee nature of the relation,* and as it is upon this that the principles governing the simple contract rest, *these added features do not affect the applicability of the principles to the share of stock.*

"Next as to the certificate. This is merely evidence of the right. In no sense is the obligation merged in the paper and thus to be treated as a chattel—*the underlying obligor-obligee relation is not affected and so the principles evolved above apply."* (p. 488.) (Italics inserted.)

. The principle that an obligor-obligee relationship between the corporate entity and the shareholder exists is not only theoretically correct but practically sound. It is demonstrated by the fact that stock is always carried on the corporate books as a liability. Furthermore, a certificate of stock also represents the stockholder's right to dividends and to a proportionate share of corporate assets on distribution. At least to that extent it must be conceded a certificate of stock evidences an obligor-obligee relationship, and to that same extent it may properly be regarded as an "evidence of debt," for the purpose of construing the intent of the framers and adopters of the constitutional amendment. The paramount interest, or at least a substantial interest, of the ordinary stockholder in all probability lies in that aspect of stock ownership which represents an evidence of debt. It is, therefore, entirely reasonable to assume such aspect was uppermost in his mind when he voted to adopt the amendment. Obviously, he did not contemplate the amendment was designed to tax his right to vote the stock in connection with the business management of the corporate entity.

That there must exist some reasonable basis for a classification made by the legislature is true. Courts cannot, of course, "perform a feat of verbal acrobatics and call an oil refinery a branch penitentiary," as we were asked to do in *State v. Kelly,* 71 Kan. 811, 81 Pac. 450. (See *Stevenson v. Metsker,* supra, p. 260.) So long, however, as a classification is not based upon an unreasonable distinction courts will not interfere. (61 C. J., Taxation, § 58.) Since the classification made in Senate bill No. 227 has a reasonable basis, was designed for the advancement of the public interest, and it does

not clearly appear the framers or adopters of the constitutional amendment intended to prohibit that classification, the legislative intent must be upheld.

As previously indicated, we are not unmindful that in *Ryan v. State Tax Commission*, 132 Kan. 1, 294 Pac. 938, this court held that withdrawal shares of building and loan associations were not classifiable as *credits* under the 1924 constitutional amendment for the reason the interest of such shareholder in the association was "neither mineral product, nor money, nor mortgage, nor note, nor evidence of debt." (p. 4.) That opinion was filed January 10, 1931. On the following 25th day of February the legislature enacted chapter 302 of the Laws of 1931 (G. S. 1935, 79-325a), by virtue of which shares in those associations are now assessed against and paid by the association itself. We understand, under that statute, shares in those associations are now taxed at the intangible rate under the administrative interpretation of our tax laws. The basis or method for arriving at the assessed value of such shares is much the same as that prescribed by G. S. 1935, 79-1101, for arriving at the assessed value of shares of stock in state banks, which latter shares are likewise taxed against and paid by the state banks, at the intangible rate. Under the present law it is difficult to see where any conflict, by virtue of the instant decision, will result in the actual taxation of the shares of stock in building and loan associations referred to in the Ryan case. If, and to the extent a conflict might arise, the views herein expressed will be controlling. The writ will be allowed. It is so ordered.

HOCH, J. (concurring in the result only): While concurring in the result reached by the decision, I cannot follow the reasoning which the opinion advances to support it.

The purpose of the statute under scrutiny is to effectuate the taxation of shares of stock in foreign corporations at the "intangible tax rate." It is said that the taxation of such shares at the regular ad valorem rate applicable to property generally leads to widespread concealment and evasion, since such shares cannot profitably be owned if so taxed. And that thereby the state and local governmental units lose a great deal of revenue. The statute seeks to reach the result by classifying such shares as "evidences of debt," and thus bring them within the permitted classifications provided by the amendment to the constitution adopted in 1924. That amendment

provides that the legislature may classify "mineral products, money, mortgages, notes and other evidence of debt" and tax them uniformly as to class.

The opinion does not say that shares of stock in a corporation are, in fact and in law, "evidences of debt"—this court has heretofore stated categorically that *"they are not"*—but upholds the statute on the theory that the court cannot say that the framers and adopters of the amendment of 1924 did not intend to include such shares within the phrase "evidences of debt." Circumstances and utterances attendant upon the submission and adoption of the amendment are invoked in support of the argument. While subscribing fully to the general principles of liberal interpretation set forth in the opinion, I cannot bring myself to subscribe to the application which is made of them. It is well settled that where there is uncertainty or ambiguity in the language of enactments recourse may be had to extrinsic evidence, such as legislative committee reports, arguments advanced by legislators in connection with the enactment, etc., in order to determine the meaning of the language under consideration, and that where there are two meanings that may be given to words or phrases the meaning which will validate the enactment should be followed rather than the one which will invalidate it. But it is also a well-established rule of interpretation that where words and phrases have no uncertain meaning and there is no ambiguity to be cleared away it must be held that the legislature meant what it said, and not what the courts have reason to believe it really intended to say. The simple fact is that a share of stock is not an evidence of debt. It is an evidence of ownership. Neither while the corporation is a going concern nor in case of liquidation is a stockholder classed as a creditor. He shares in benefits only after all demands of creditors have been satisfied. By what process then do we conclude that when the legislature used the phrase "evidence of debt" it meant to include something which in fact is not an "evidence of debt"? And by what divination do we read the minds of the voters who adopted the amendment and determine they, too, meant to include within the phrase that which the phrase itself does not include? It is undoubtedly true, as the majority opinion argues, that words and phrases are often loosely used, and that the popular and ordinary meaning must be given weight in interpreting statutes and constitutions. But that rule need be invoked only where two meanings are involved. Suppose we had before us for interpretation a statute imposing cer-

tain obligations upon *"stockholders,"* in line with their well-established relationship to the corporation. Could the word *"stockholders"* be properly stretched to include *"bondholders"* merely because many people use the words "stocks and bonds" with quite hazy ideas as to the legal and practical distinctions between the two? Certainly no sound rule of interpretation, however liberal, would justify that result.

If, then, the statute before us is to be upheld, what is the ground for doing so? For answer, attention is directed to the case of *Stevenson v. Metsker*, 130 Kan. 251, 286 Pac. 673. In that case this court had before it the question of whether the legislature could provide for taxation of bank stock at the "intangible rate" instead of at the regular ad valorem rate. In substance the question was the same as the one here presented. The statute was upheld. The reason advanced in the opinion was that the court would look back of the mere surface of the words and seek to reach the real "essence" of the matter; and that such a process revealed that the real purpose of the amendment was to permit the classification of "intangibles;" that bank stocks are "intangibles." and that therefore the statute was valid. The opinion flatly stated that "it is not material that a share of bank stock, regarded simply as a share of bank stock, is not 'mineral, money, mortgage, note or other evidence of debt.'" Justice Harvey, in a very able dissenting opinion, attacked the theory that the amendment of 1924 was properly to be regarded as an "intangible tax amendment," and called attention to the fact that the amendment itself not only did not contain the word "intangible" but that at least two of the classes of property specified in the amendment—namely, mineral products and money—are not "intangibles." They are "tangibles." I may say frankly that the argument made in the dissenting opinion strongly appeals to me. But the court, in a fully-considered opinion, held otherwise, and the power to give bank stock the intangible rate is now settled. On what theory can we say that the decision as to bank stock does not apply with equal force to corporation shares? Whatever differentiation might be made in other cases that may arise, I discern no grounds for saying that shares of stock in an ordinary corporation are not as "intangible" as shares of stock in a bank. In fact, it may well be argued that in some cases at least they are *more* "intangible," if such a comparative may be used. For instance, in the case of stock in an investment corporation, where the underlying investments are entirely securities of one

sort or another, we would have a case of "intangibles" resting upon "intangibles."

It is contended that the court failed to follow *Stevenson v. Metsker* when it came to deal with building and loan shares in the case of *Ryan v. State Tax Commission*, 132 Kan. 1, 294 Pac. 938. Whatever may be said for that contention, it must be noted that while the court did say in that case that tax classification of certain classes of building and loan shares "was not permissible under the 1924 amendment," the comment applied only to such shares "*other than permanent shares.*" It would appear, at least by implication, that the court thought "*permanent shares*" might be so classified. It must also be noted that the case dealt with the effect of certain statutes on the taxation of "rural credit shares" and "withdrawal shares" of building and loan associations. It simply held that the effect of these statutes was to leave the former class *exempt* from taxation and the latter class *not exempt*. Accordingly, I do not see that the Ryan case has much bearing on the question here.

Consider, also, the case of shares of stock in domestic—that is to say, Kansas—corporations. Our statutes have long "classified" them in a way that amounts, in effect, in many cases, to exempting them entirely from taxation. The individual holder of such shares need not return them for taxation provided the corporation itself lists its outstanding stock, and the corporation is then permitted to offset against its capital stock the property investments subject to taxation. (G. S. 1935, 79-310.) This is permitted, although it is well settled that shares of stock in a corporation are personal property separate and distinct from the property of the corporation. They belong to different owners—the shares to the individual holders and the property to the artificial person, the corporation. (7 R. C. L. 196.) The statute is justified on the ground of preventing double taxation, and no question is here raised as to its propriety. But on the bare question of the *power* of the legislature, under the constitution, to exempt shares of corporation stock, I see no convincing differentiation between shares in a domestic and a foreign corporation.

But it may be said that the issue does not involve the right to *exempt* but the right to *classify* and *apply* a *lower rate*. Two lines of decisions are to be noted, both dating back to early cases. The first one established the principle that under the constitution's requirement of "a uniform and equal rate of assessment and taxation" the legislature is without power to classify property for taxation

purposes. These restrictive decisions led eventually to the adoption of the amendment of 1924, which seeks to escape the rigidity which the constitution, as thus construed, had imposed, and to achieve greater flexibility in the tax structure. The second line of cases established the doctrine that while the constitution specified certain classes of property for permanent exemption, the legislature might add new classes of exempted property. There have always been those who have believed that the first line of cases imposed needless rigidity—that the constitution might well have been interpreted to permit broad classification of property for taxation purposes, provided, of course, such classification was based upon the public interest and the same rate applied to all property in the class. However that may be, the other view became the settled law, and the amendment of 1924 was an effort to ease the situation created by it.

Acting under the principle established by the second line of cases, various additional classes of property have been given tax exemption. With no disrespect for the able justices who helped establish these two early lines of decisions, I must confess that the reasoning at times advanced to harmonize them seems to me to command greater respect for its age than for its logic. It is a rather elusive logic which holds that no matter what consideration of public interest may exist for doing so the legislature is without power to "classify" property into broad general classes and apply a lower rate to one than to the other, but if it will only carry the "classifications" a little further and classify into a status of *tax exemption* the enactment may be upheld. I am not unmindful of the fact that the constitution seems to imply that the exemption of personal property "to each family" may be increased beyond the two hundred dollars named in the constitution. But the statutes which have added to the exemptions have not been of that sort. They have simply added new classes of exempted property. These two lines of cases, however difficult the task of teaming them, constitute the broad background of the issue presented in the case before us.

If the interpretation of the 1924 amendment made in *Stevenson v. Metsker*, supra, is to be disregarded it would be better, in my opinion, for the court frankly and plainly to say so. But unless the reasoning which supported that opinion is to be repudiated, the considerations of logic, consistency and stability in the law seem to me to require validation of the statute before us. The evident purpose of the statute is to apply the "intangible tax" rate to the

shares of stock of foreign corporations. The legislative method employed calls for no judicial questioning, provided the method itself is not banned by the constitution. The legislature employed the method it believed best for accomplishing the desired result.

THIELE, J. (dissenting in part): With the first seven·paragraphs of the syllabus, and what is said in the opinion in respect thereto, I am in general agreement. I cannot concur in the eighth paragraph of the syllabus, what is said in the opinion with respect to it, nor with the conclusion reached by the court.

The question is whether under our constitutional provisions with reference to taxation, the legislature may enact valid legislation declaring shares of stock in a foreign corporation to be "notes and other evidences of debt."

As originally adopted, article 11, section 1, of our constitution stated:

"The legislature shall provide for a uniform and equal rate of assessment and taxation," etc.

From the inception of our state government, down to the time the above section was amended, it was repeatedly held that by reason of it, the legislature was without power to classify property in such manner that one class would be assessed or taxed on a different rate basis than another. In some opinions may be found statements that a permissible construction would have allowed the legislature considerable leeway, but no opinion of this court has so held.

In 1915 the legislature attempted by chapter 250 of the session laws of that year to provide for the payment of a registration tax on mortgages, the constitutionality of the act being challenged in *Wheeler v. Weightman,* 96 Kan. 50, 149 Pac. 977. In that opinion is a rather exhaustive review of former decisions, in which it is said:

"The constitutional command is that the legislature shall provide for a uniform and equal rate of assessment and taxation. Assessment is a prerequisite to the application of any rate of taxation, and assessment includes listing and valuation. This is fundamental and cannot be evaded by any shift ·or device whatever." (p. 53.)

After discussing the power to create exemptions, it was said:

"The notion that property taxes might be abandoned and that public revenues might be raised by franchise, privilege, and occupation taxes, and other taxes of like kind, was not present in the minds of the framers of the constitution or of the people who adopted it. To their minds the property of the state

was to be taxed as a matter of course, and all property was to be taxed according to its value, except that property which served the state in some peculiar way, whereby public benefits resulted equivalent to the benefits derived from taxes, might be exempted; but exemptions of this character could not be employed to build up large accumulations of untaxed property contrary to the fixed rule requiring a uniform and equal rate of assessment and of taxation." (p. 64.)

The final conclusion was:

"The result is that the statute undertakes to classify the property of the state for the purposes of taxation, to place real-estate mortgages, or, speaking accurately, some real-estate mortgages, in a class by themselves, and to subject such mortgages to a specific tax, all contrary to the express command of the constitution. This cannot be done, and the statute is void." (p. 77.)

The above case was decided in 1915. Although there had been some agitation for a change in the constitutional provision prior thereto, thereafter more determined efforts were made, and the result was that in 1924 the constitution was amended so that the legislature might classify and tax uniformly as to class "mineral products, money, mortgages, notes and other evidences of debt," and the question now under consideration arises under the amendment.

Thereafter, a series of acts was passed attempting to make classification and tax accordingly, i. e., mortgage registration taxes, and the so-called intangible tax laws. I shall devote no time to discussion of misuse of the word "intangible," nor to the proposition that the constitutional amendment did not refer to intangibles. An outgrowth of these statutes was the flood of cases wherein national banks, by virtue of the laws of the United States, sought and obtained the benefits of the rates specified in the statutes classifying the so-called "intangibles."

The effect of stockholders in national banks obtaining a rate lower than the ad valorem caused a claim to be advanced by stockholders of state banks that they were being discriminated against, and the action of *Voran v. Wright* followed. Opinion on the first submission is reported in 129 Kan. 1, 281 Pac. 938, and on rehearing in 129 Kan. 601, 284 Pac. 807. Whether that opinion is legally sound, or whether the views expressed by Mr. Justice Harvey in his dissent should have been followed, I shall not discuss. It must be conceded that until the court overrules the opinion, it states the law. In effect, it held that stock in a state bank shall be taxed at the so-called intangible rate. Fundamentally, the opinion seems to me to be based on lack of uniformity which would be accorded shares of national and state banks if a different conclusion had been reached, and not on the basis that

shares of stock were the types of property that could be classified and taxed under the constitution as amended. It is said in the opinion:

"It is not seriously contended by anyone that shares of stock are within the definition given in the statute of money or credits, neither do they come under the heading of notes or other evidence of debt. They simply represent the proportionate interest of the holder in the earnings and the final distribution of the assets of the company, and not a distinct title to the money or property of the company (7 R. C. L. 304)." (p. 612.)

The same question came before the court under a different factual situation and was considered in *Stevenson v. Metsker*, 130 Kan. 251, 286 Pac. 673, and again Mr. Justice Harvey dissented. For present purposes I shall ignore the dissent, for the court's opinion has not been overruled. There it was held shares of stock in a state bank should be taxed at the so-called intangible rate, the basis of the opinion being that the assets of a bank, reflected in determining value of stock for purposes of taxation, consist almost wholly of money, notes, bonds, mortgages and evidences of debt, referred to in the opinion as intangibles.

In *Ryan v. State Tax Commission*, 132 Kan. 1, 294 Pac. 938, the question was whether shares of building and loan stock, other than permanent shares, could be classified and taxed under the con- stitutional amendment. In the opinion it was said:

"The court is obliged to say the attempted classification in the statutes of 1925 and 1927 [so-called intangible tax acts] of building and loan association shares, other than permanent shares, as credits, was not permissible under the amended constitution." (p. 3.)

It may here be remarked that under the building and loan statutes every class of stock (except permanent stock) which may be issued is withdrawable as to its value, and most of the shares issued have a fixed maturity date, and, without pursuing the matter fully, have many more aspects of an evidence of debt than can possibly be attributed to shares in an ordinary corporation. Notwithstanding, this court, without a dissent, held that classification of such shares was not within the purview of the constitution as amended.

*Citizens Bank v. State Tax Commission*, 132 Kan. 5, 294 Pac. 940, was an action brought to settle questions relating to taxation of a bank, a trust company and a mortgage company. Without going into detail, it may be said the court adhered to its opinion in *Voran v. Wright*, and *Stevenson v. Metsker*, supra, and in effect held the character of the assets of the corporation determined the matter. It was said, however, that—

"Shares of corporate stock are not mineral, nor mortgage, nor note, nor other evidence of indebtedness excepted by the amended constitution from the requirement of uniform and equal rate of assessment. Shares of corporate stock are simply property interests of shareholders, on equal footing with the common unclassified property of the state." (p. 14.)

No other cases involving taxation of shares in a corporation at so-called intangible tax rates are called to our attention. It will be noticed that each of the cases mentioned involved stock in corporations, the assets of which were largely included in the constitutional language of money, mortgages, notes and other evidences of debt, and that the decisions, to a great extent, were based on that fundamental fact.

Whether the basis for the above decisions was logically and legally sound or not, it was apparent that under them stock in a foreign corporation was not entitled to be taxed at other than the ad valorem rate. In order that such stocks might be taxed at the so-called intangible rate, some change must be made, either in the constitution or in the statute. To accomplish that result the legislature, by the enactment of the statute now under consideration, declared a share of stock to be something that it is not—an evidence of debt. If that is permissible, there is no limit to the extent of its fiats.

It may be suggested the legislature has heretofore passed acts under which, for purposes of taxation, property which might otherwise be returnable as real property is to be considered as personal property, e. g., Laws 1898 Special Session, ch. 37, § 1, G. S. 1935, 79-322, and property which might otherwise be returnable as personal property is to be considered as real property, e. g., Laws 1911, ch. 316, § 22, G. S. 1935, 79-422. In those instances, however, no effort was made to classify the property in any manner so that the amount of taxes due would be other than at the ad valorem rate applied to the full assessed value of the property. In the instant case the statute effects a change in manner of assessment, and makes applicable a rate of taxation different from that applied either to real or personal property generally.

The court's opinion, as I understand it, is based on the general proposition that the adopters of the constitutional amendment thought the amendment covered more than it stated, and something much different than it stated—that they believed it covered all sorts of intangible property and that stock in a corporation is intangible. To argue to the contrary is said to be legalistic. I can-

not agree. Limited to the issues in this case, the court's opinion would lead to the conclusion the people deliberately voted an amendment to permit shares of stock in a foreign corporation to be taxed at a different rate than the corporation might have had to pay had it been domiciled here.

Our cases deal with financial corporations. How different is the case now before us? The stock involved is that of a telephone company. Such companies at least are not supposed to be financial institutions. Their assets are poles, wires, conduits, switchboards, telephone instruments, etc. No doubt they have some bona fide intangibles such as franchises, rights of way, etc., but it is a fact beyond argument that the bulk of their assets is physical assets that cannot be called either intangibles, or money, mortgages, notes or evidence of debt. With more plausibility some of their equipment might be classified as "mineral products" under the amendment, but the legislature has not passed any statute making any classification under that particular permission. Neither should it be assumed the adopters of the amendment were ignorant of the fact that in numbers and assets many more foreign corporations were engaged in commercial ventures than in financial affairs.

There can be no argument but that our constitution restricts rather than grants power. But that the constitutional provision under consideration here, both before and since its amendment in 1924, was and is a restriction on the power of the legislature to classify property for purposes of taxation, is not open to debate, unless we see fit to overturn our holdings from the very beginning of statehood, *Hines et al. v. City of Leavenworth,* 3 Kan. 186, being one of the first, and the annotations in various of our statutes showing many others. Restrictive constitutional provisions should control the legislature just as restrictive legislative enactments control the people. When the constitution prohibits, the prohibition should be observed. Once it be conceded the legislature can make a thing something that it is not, then it must likewise be conceded that by such process every restriction contained in the constitution and every right granted or preserved by it may be avoided by the simple process of giving to the particular subject a name or appellation different from that usually associated with it. I do not concede that to be within the legislative power.

I am authorized to say that Mr. Justice HARVEY concurs in this dissent.