THE COMMERCIAL NATIONAL BANK OF KANSAS CITY, Administrator with the Will Annexed of the Estate of Albert R. Jones, Deceased, *Appellant,* v. THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, and M. J. QUAINTANCE, County Treasurer of Johnson County, Kansas, *Appellees.*

No. 45,018

THE COMMERCIAL NATIONAL BANK OF KANSAS CITY, Administrator with the Will Annexed of the Estate of Mabel Neer Jones, Deceased, *Appellant,* v. THE BOARD OF COUNTY COMMISSIONERS OF JOHNSON COUNTY, KANSAS, and M. J. QUAINTANCE, County Treasurer of Johnson County, Kansas, *Appellees.*

(440 P. 2d 634)

Opinion filed May 11, 1968.

*Patrick B. McAnany,* of Kansas City, argued the cause, and *Willard L. Phillips, Thomas M. Van Cleave, Jr., James J. Lysaught, John J. Jurcyk, Jr., Bill E. Fabian* and *Robert E. Fabian,* all of Kansas City, were with him on the brief for the appellant.

*Hugh H. Kreamer,* Assistant County Attorney, argued the cause, and *James W. Bouska,* County Attorney, was with him on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: These actions were brought to recover taxes which were paid under protest on intangible property. The plaintiff was denied recovery in both actions and has appealed. The appeals have been consolidated for hearing in this court.

None of the facts are in dispute. The Commercial National Bank of Kansas City, hereafter referred to as plaintiff or bank, is the Administrator with Will Annexed of the separate estates of Albert R. Jones and Mabel Neer Jones, both deceased. For the year 1958 the Albert R. Jones Estate had among its assets various corporate stocks of the value of $6,595,285, while included in the Mabel Neer Jones Estate were stocks valued at $327,108.

The stocks in both estates were assessed at their actual value and a tax of five mills on the dollar was levied against them in compliance with the provisions of G. S. 1949, 79-3109. On behalf of the Albert R. Jones Estate the bank protested the payment of $23,083.50 while on behalf of Mabel's estate the amount protested was $1144.88. These two amounts represented, as to each estate, that portion of the total tax which was based on the value of the stocks in excess of 30% of actual market value.

It was stipulated in each case that the corporate stocks were valued for ad valorem tax purposes at their true market value as of March 1, 1958, while real and tangible personal property in Johnson County, Kansas, was assessed for taxation purposes that same year at not to exceed 30% of its true or actual market value.

The present actions were commenced within thirty days after the protests had been filed with the county treasurer, as is required by G. S. 1949, (now K. S. A.) 79-2005. No question is raised either as to the validity of the protests or the correctness of the amounts paid under protest. It may be appropriate to observe in passing, that prior to paying the protested tax, the bank filed a complaint concerning the assessments with the Johnson County Board of Equalization and from an adverse ruling of that board appealed to the State Board of Equalization, which likewise denied relief.

Throughout the proceedings before the county and state boards of equalization, the bank contended that the assessment of the stocks was excessive and discriminatory, in that they were assessed on the basis of their full value while at the same time tangible property, both real and personal, was assessed on but 30% of actual value. The same charge of discrimination formed the basis of the

written protest filed by the bank with the county treasurer and is the bone of contention in this lawsuit.

It is earnestly argued that the assessment of stocks and other intangible property for ad valorem tax purposes at actual value, as is provided in G. S. 1949, (now K. S. A.) 79-3109, while at the same time tangible property is assessed at only 30% of its actual or market value, violates Article 11, § 1 of the Kansas Constitution. This constitutional provision, so far as material to this case, reads as follows:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that mineral products, money, mortgages, notes and other evidence of debt may be classified and taxed uniformly as to class as the legislature shall provide. . . ."

Originally the provision provided only for an equal and uniform rate of taxation, without exception as to class, and apparently this sufficed to meet the financial needs of this state for many years. However, as taxation became ever more burdensome in meeting the costs of expanding government and as the rates of levy correspondingly increased, there was a growing tendency on the part of persons owning intangibles to withhold that form of wealth from the questing eye of the tax assessor. It was in large part, we are told, to force intangible property out of hiding and into the view of taxing authorities, that public demand arose for the adoption of some equitable method of taxing intangibles which would not subject them to prohibitive taxation, yet require that character of property to assume its just and rightful share of the expense of government. (See Justice Hoch's concurring opinion in *Hunt v. Eddy*, 150 Kan. 1, 90 P. 2d 747.)

Thus, in both 1913 and in 1919 the legislature adopted resolutions (L. 1913, ch. 335; L. 1919, ch. 335) submitting to the electorate amendments which would have empowered the legislature to establish an equitable system for raising state and local revenue, and to classify the subjects of taxation in order to secure just returns therefrom. These proposals would have granted the legislature exceedingly broad powers to classify property, but both were rejected at the polls.

However, the problem did not abate, and in 1923 a third resolution was adopted (L. 1923, ch. 255) proposing that Article 11, § 1 be amended by incorporating therein the present exception permitting mineral products, money, mortgages and other evidence of debt to be classified and taxed uniformly as to class. Kansas voters

approved this amendment at the general election November 4, 1924, and the constitutional provision with which we are now concerned assumed its present form.

It was in 1931 that legislation was first adopted taxing money and credits, other than mortgages, at the rate of five mills on the dollar. (L. 1931, ch. 311 and ch. 312 now appearing, as amended, as K. S. A. 79-3108 to 79-3125.) In 1958, the year with which we are presently concerned, § 79-3109 provided, in material part, as follows:

"That money, notes and other evidences of debt as hereinbefore defined are hereby separately classified for taxation purposes and shall hereafter be taxed annually at the rate of five mills on the dollar of actual value thereof; and hereafter such money, notes and other evidence of debt shall be exempt from all other taxation. . . ."

We should add that by statutory definition shares of stock are included within "notes and other evidence of debt" (K. S. A. 79-3108) and such inclusion has been upheld in *Hunt v. Eddy*, supra. At this juncture it may be pointed out that the foregoing statute was amended in 1959 giving the holder of intangibles the option of paying a tax equivalent to 3% on the total gross earnings therefrom for the preceding calendar year, or of paying a tax of five mills on the dollar of actual value. This amendment has no application to the instant lawsuit, which of course must be determined on the basis of the statute as it was in 1958.

We turn now to the principal question: Does the assessment of intangible property, as the same is defined in K. S. A. 79-3108, at its actual or market value while, at the same time, tangible property is assessed at 30% of its fair or justifiable value, constitute arbitrary discrimination which violates Article 11, § 1, of the Kansas Constitution? In view of the exception incorporated in Article 11, § 1 through the adoption of the 1924 amendment, our answer must be in the negative.

As we have previously pointed out, the constitutional provision originally did nothing more than to direct the legislature to provide for a *uniform and equal rate of assessment and taxation.* However the amendment adopted in 1924 permits intangible and certain other property to be *classified and taxed uniformly as to class.* It is our judgment the verb "taxed" was used in its comprehensive sense, as covering the entire taxing process, of which assessment is an integral part.

The plaintiff argues, however, that the 1924 amendment contains

no specific reference to assessment, and accordingly, that uniformity in the assessment of *all* property is still required. In support of this contention, the bank argues that it is significant that the original provision concerning uniformity alluded, and still alludes, both to *assessment* and *taxation* while the 1924 exception refers simply to *classification* and *taxation.* The bank would thus have us construe Article 11, § 1, in its amended form, as permitting mineral products, money, mortgages, notes and other evidence of debt to be *classified and taxed uniformly as to class,* but requiring property within the class to be *assessed uniformly with all other taxable property.*

We believe no such anomaly was intended. The term "assessment" is frequently used as being comprehended within the taxation process itself and as constituting only a component part thereof. In 84 C. J. S., Taxation, § 391a, p. 746, we find this statement:

"Assessment is one of the three parts of the process of raising revenue by tax on property, the other two being the levy, . . . and the collection . . ."

In *Meadville City, Ap., v. Odd Fellows' Home,* 128 Pa. Super. 180, 193 Atl. 662, the court said:

" 'Taxation' is a broader and more comprehensive term than 'assessment.' . . . The content of the former embraces the latter and assessment is but one of the steps in the whole process of taxation. . . ." (p. 184.)

Assessment has been used somewhat imprecisely in a variety of contexts, quite often being equated with taxation, itself, as we discern from the following quotations taken from 84 C. J. S., Taxation, supra:

"The term has been further variously defined as a valuation; a tax; an exercise of the taxing power; laying a tax; levying a tax; a proceeding which creates a charge on the property specified; . . ." (p. 747.)

"The word 'assess' has a broad or narrow meaning, according to the sense or connection in which it is used. The narrow meaning usually is limited to the listing and valuing of property for taxation; in its broadest sense, the term includes the entire process of listing, valuing, levying, and extending the tax on the rolls. So, the term is used at times to include all the steps involved in imposing a tax on property." (p. 750.)

The Supreme Court of Tennessee, speaking on the subject in *City of Johnson v. Clinchfield R. R. Co.,* 163 Tenn. 332, 43 S. W. 2d 386, had this to say:

"A definition of 'Assess' given by Bouvier is 'To tax;' and 'assessment' is defined as 'laying a tax.' This is the broad and generally accepted meaning, although the authorities cited, and others, of course recognize that the words in strictness carry the distinctive meaning of fixing the value of property for taxation. But the one meaning includes the others, that is, the authority to tax

property contemplates its assessment, and the authority to assess property implies authority to tax it. . . ." (p. 336.)

It is of little moment whether, in using the word "taxed" in the 1924 amendment, the legislature considered it as being synonymous with, or as including, assessment. In either case, we deem it clear that the framers of the amendment intended the provision to permit money and credits to be classified separately for taxation, as taxation is understood in its total aspect.

A situation quite analogous to the one now before us came before the Kentucky Court of Appeals in *Kentucky Finance Company v. McCord*, Ky., 290 S. W. 2d 481. Section 171 of the Kentucky Constitution originally required taxes to be uniform on all property, while § 172 required all property to be assessed at its fair cash value.

Section 171 was thereafter amended to permit classification of property for purposes of tax rates and exemptions. Legislation was subsequently enacted subjecting intangible property to state taxes, only, and at a minimal rate. Real estate and tangible personal property continued subject to both state and local taxes at rates higher than those imposed against intangibles.

In 1953, intangibles were assessed in Fayette County at 100% of its value while real estate was assessed at not to exceed 29.7% of its value. Suit was brought alleging that this constituted unconstitutional discrimination and that assessment of intangibles should be reduced to the level of real estate.

In rejecting this claim, the court observed that the original purpose of §§ 171 and 172 was to achieve equality in the burden of taxation, which could not exist without uniformity both in mode of assessment and rate of taxation. The court went on to say that the amendment of § 171 could only be considered as an abandonment of the concept of equality of burden between all classes of property and as authorizing the legislature to vary the burden between classes. On page 482 the court states:

". . . We can find no basis for interpreting Section 172 as still requiring uniformity of assessment *as between classes*, when, in view of the 1915 amendment to Section 171, equality of burden *as between classes* no longer is contemplated."

This court has recognized the concept of equality in the tax burden. In *Addington v. Board of County Commissioners*, 191 Kan. 528, 382 P. 2d 315, suit was filed to recover taxes paid under protest, it being contended that assessment of plaintiff's property at more than 30% of its true value while other property was assessed at 12%

of actual value was illegal and the result of systematic and oppressive discrimination. In holding that the arbitrary distinction made between the plaintiff's property and other property constituted a fraud on plaintiff's rights, this court said:

"Uniformity in taxing implies equality in the burden of taxation, and this equality cannot exist without uniformity in the basis of assessment as well as in the rate of taxation. . . ." (p. 531.)

We believe the converse must be true, as well. Where equality of the tax burden is no longer required as between various classes of property, which is now true with relation to tangible and intangible property, uniformity in assessment can no longer be viewed as essential.

Simple logic illustrates the truth of this reasoning. The premise having been abandoned that tangible and intangible property should equally bear the burdens of taxation, uniformity in the assessment or valuation of the two classes of property has no practical meaning. For whatever advantage might accrue to either type of property through the medium of uniform valuation would prove illusory when such advantage might be nullified by the mere expedient of varying the rate of tax.

The bank further maintains that even though the legislature might legally have provided a different basis of assessment for intangible property than for tangible, it has not chosen to do so, but has continued to provide that all property is to be assessed at actual value. In effect, what the bank is saying is that although the Jones' stocks were correctly valued, the assessment was void because tangible property was incorrectly valued at a fraction of its true worth. We fail to find merit in this approach under the facts shown of record, where the resulting discrepancy violates no constitutional precept.

How tangible property in Johnson County came to be valued at 30% of its market value for the year 1958 is not disclosed in the record. No contention has been advanced that the valuations, however inaccurate they may have been, resulted from bad faith on the part of taxing officials or from the deliberate adoption of a fraudulent design or plan.

We pause here to point out that since these actions arose a change has been effected in the assessment procedure relating to tangible property so that K. S. A. 79-1406 now provides:

"All property, real or personal, shall be valued at its justifiable value in money, and all real and tangible personal property which is subject to general

property taxes shall be assessed at thirty percent (30%) of its justifiable value . . . ."

Thus under present statutes, real and tangible personal property is by legislative fiat assessed at 30% of justifiable value, while intangibles remain taxable at the rate of five mills on the dollar of justifiable value.

In our consideration of this case we have not overlooked the several authorities cited in plaintiff's brief. Many of the cases arose prior to the 1924 amendment of Article 11, § 1 and are for that reason inapplicable. Others involve discrimination between property of the same class or relate to fraud and arbitrary conduct on the part of taxing authorities.

In concluding, we feel justified in observing that there appears little reason for the bank to complain that the corporate stocks in its decedents' estates have been singled out for taxation more burdensome than that borne by tangible property. Intangible property, despite application of the tax rate of five mills on the dollar on its full value, still occupies a singularly favorable position in the tax hierarchy.

No error is made to appear in the judgment of the court below and the same is affirmed.